[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 353 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 354 
Coy Patrick Crowe was indicted for the capital murder of one James Taylor, whom he shot with a pistol. Mr. Crowe, the appellant herein, was indicted pursuant to § 13A-5-40 (a)(5), Code of Alabama 1975, for murder of a deputy sheriff while such deputy was on duty.
The jury returned a verdict of "guilty of capital murder as charged in the indictment," and, after a separate sentencing-phase hearing, the jury recommended that the appellant "be punished by life imprisonment." The trial court, after its separate sentencing hearing and determination of the aggravating and mitigating circumstances, ordered that the advisory verdict of the jury was not the proper sentence in *Page 355 
this cause, and sentenced the appellant to death by electrocution.[1]
Jerry Taylor testified that he was the brother of James Taylor, the deceased. He stated that the deceased's wife was the woman sitting at the prosecutor's table. He stated that he saw his brother on July 7, 1982, lying on the ground beside a marked patrol car. He stated that James Taylor was dead. He further stated that James Taylor was a Winston County Sheriff's Deputy and was in uniform when he observed him lying on the ground.
Jack Gilliland testified that he was the chief deputy in the Winston County Sheriff's Department. He stated that the deceased was working the night shift at the time of the shooting. He stated that the appellant's brother, Billy Crowe, was in the Winston County Jail in early July, 1982, on a charge of capital murder. He further stated that the Winston County Jail is located in Double Springs, Alabama.
Gilliland testified that he lives approximately two blocks from the Winston County Jail. He was on call the night of July 6 and early morning July 7. He received a telephone call from Patty Alexander, the radio dispatcher, at 2:40 a.m. on July 7, 1982. As a result of this telephone call, he dressed, grabbed his gun, and drove to the jail. He circled the block around the jail and came upon Deputy Taylor. The door of Deputy Taylor's patrol car was open and Deputy Taylor was kneeling face down on the ground. Gilliland drove his car up beside Taylor's, opened his car door, leaned out and felt Taylor's neck. He stated that there was no pulse and Taylor appeared to have been shot. Gilliland then drove his car to the front steps of the jail, got out of the car and went inside the jail. He then turned the lights inside the jail off and "proceeded to call everybody, notify everybody, what had happened." (R. 496)
Gilliland stated that as he was exiting his car, a "green/beige colored Buick with a black vinyl top" drove past the courthouse. He stated that he saw this same automobile the next day in a wooded area approximately four miles west of Double Springs.
Patty Alexander testified that she was the radio dispatcher for the Winston County Sheriff's Department. She was working the night that Deputy Taylor was killed. She stated that the appellant's brother, Billy Crowe, was in the Winston County Jail that night.
Ms. Alexander testified that Deputy Taylor was on duty the night of July 6 and early morning July 7, 1982. Deputy Taylor was sitting in his patrol car outside the jail. She could see him through a window in the courthouse. He was approximately thirty-five feet away. She stated that Deputy Taylor had been in her office shortly before he was shot. About fifteen minutes after Taylor went outside, she heard a car door slam. She went to the front door and looked outside. She saw a dark haired man about six feet tall with a medium blue shirt on run to a stop. This man had a pistol in his hand and fired the pistol toward Deputy Taylor's patrol car. She heard three or four shots. She also saw a man with a white shirt on, running away. She stated that at this time she went and called Jerry Thorn, Jack Gilliland, and the Double Springs Police.
Bobby Lee Miller testified that he had been charged in this case. The trial court advised him of his right not to testify, but he chose to testify. He stated that on the weekend of July 3 and 4, 1982, he, the appellant, and some of the appellant's relatives spent the weekend camping on an island in Smith Lake. During the weekend the appellant asked him to help appellant break Billy Crowe out of the Winston County Jail. He told the appellant he would not help. On July 4, the group left the lake and went to the mobile home of appellant's uncle, Jimmy Dean Miller. While talking at the trailer, appellant again asked him to help break Billy Crowe out of jail, and again he declined to do so.
Miller testified that, when he again told the appellant he would not help with the *Page 356 
jail break, appellant asked him to go to Morgan County and post bail for Billy Don Hass, who was in jail there. Appellant gave him $800 and Miller, along with one Janette Hanes, drove the appellant's white and tan Buick to Decatur and got Hass out of jail. This was on Monday, July 5, 1982. They drove back to Jimmy Dean Miller's mobile home. After they arrived at the mobile home, appellant asked Hass if he would help break Billy Crowe out of jail. Appellant told Hass his plan. Miller stated that there was no more talk about the jail break after that conversation. Everyone began playing cards and around 1:30 a.m., the appellant asked Hass if he was ready and they walked out the door. Miller stated that the appellant and Hass got in the appellant's car. He stated that the appellant had a pistol between his legs and Hass had a sawed-off shotgun. He stated that he did not see appellant and Hass again.
Stanley Carr testified that he was an agent employed by the F.B.I. On December 11, 1982, he and his partner Gwin Hutfer, spotted the appellant at a Shoney's restaurant in Nashville, Tennessee. They ordered the appellant to stop but the appellant got in his car and attempted to escape. The agents shot the tires of appellant's car and he skidded to a stop in the parking lot. Appellant was arrested. About fifteen minutes after this, other F.B.I. agents arrived and the appellant was read his Miranda warnings. Appellant was placed in a car to be transported to the Nashville Jail. On the way to the jail appellant initiated a conversation by thanking them for not "blowing him away" and further indicated that someone else might have shot him instead of the car tires. Appellant then asked if he would be going back to Winston County and one of the agents responded, telling him that he would be going. back "to stand trial for the charges he was arrested for." The appellant then stated that he was afraid to go back there "because he might be mistreated or even killed by the local authorities." One of the agents then made a comment to the effect that the officer in Winston County would have appreciated appellant not shooting him. The appellant responded that there was nothing he could do about that now, he could not bring him back. (R. 598)
Gwin Hutfer testified that he was an F.B.I. agent and with Agent Carr when the appellant was captured in Nashville, Tennessee. He testified to the same facts as Carr did.
Jerry Thorn testified that he was a Winston County Sheriff's Deputy in July, 1982. He stated that James Taylor was working the night shift on July 6, 7, 1982. At approximately 2:30 a.m., July 7, 1982, he received a telephone call that Taylor was being fired on at the Sheriff's Department. He got dressed, grabbed a pistol and a shotgun, and proceeded to drive to the Sheriff's Department. When he arrived at the Sheriff's Department he could see Jack Gilliland standing in the doorway. Gilliland told him to go find Hobby Walker, a Double Springs policeman. He drove through town and found Walker's police car at Curley's Sanitation. He got out of his car and could see the trunk lid of Walker's police car shaking. He opened the trunk and Walker and Irving Gilbreath — the night watchman at Curley's Sanitation — got out. He stated that Walker gave him a description of the persons who locked them in the trunk and the vehicle they were driving. Walker stated that the vehicle was either a tan top with a light bottom or a dark top with a yellow bottom Buick automobile. Thorn then called the dispatcher and advised her to broadcast this information.
Anna McClain testified that the appellant was her husband's nephew. She sold the appellant a 1973 Buick automobile in June, 1982. She stated that she purchased the tag for this car at the appellant's request and had it registered in the name of George Hamilton, again at appellant's request.
She stated that on July 6, 1982, she and her husband went to Jimmy Dean Miller's residence. They arrived at approximately 11:15 p.m. She stated that when they arrived there were a number of people *Page 357 
present. She stated that Jimmy and Mabel Miller, a girl named Janette, Bobby Miller, Dorothy Herron, Jonathon Crowe, and Debbie Barber were in the residence. Appellant and Billy Don Hass were also there and were both asleep.
She stated that about an hour and one-half or two hours later, the appellant and Hass left in appellant's car. Everyone else stayed there playing cards.
Earnest McClain testified that Anna McClain was his wife. His testimony was substantially the same as hers.
Janette Hanes testified that she went with Bobby Miller to get Billy Don Hass out of jail on Monday, July 5, 1982. They went in appellant's car, a white Buick. They took Hass back to Jimmy Dean Miller's then left later that day. She stated that she and Bobby Miller returned to Jimmy Dean Miller's on Tuesday. She stated that everyone was playing cards except the appellant and Hass. She further stated that at approximately one a.m. the appellant and Hass left Jimmy Dean Miller's. No one else left the trailer that night. She has also been charged in this case, but not indicted.
Irving Gilbreath testified that he was the night watchman at Curley Sanitation on July 6/7, 1982. He and Hobby Walker were sitting in front of the building in the early morning hours of July 7, 1982, when a "`72 or `73" Buick, light colored body and dark top, pulled up behind Walker's patrol car. The driver of the Buick got out and asked "where he could get on 278." He stated that he observed another individual in the Buick. Walker began telling the driver of the Buick how to get on Highway 278 and suddenly the man produced a pistol and began taking Walker's handcuffs and gun. At this point the other man got out of the Buick armed with a sawed-off shotgun. The driver of the Buick then handcuffed Gilbreath and Walker together, then forced them into the trunk of the patrol car. The gunmen then closed the trunk and drove away.
Gilbreath stated that he attended a lineup in Decatur later that same day. He stated that he told officers conducting the lineup that one of the men looked familiar to him, was similar in appearance to the man who held the pistol that night. He further stated that he picked the appellant out of a lineup several months before trial. He stated that he was certain that the appellant was the man holding the pistol that night.
Steven Cole testified that he picked up Hass hitchhiking at approximately 10:00 a.m., on July 7, 1982, and gave him a ride to Hartselle, Alabama.
Josefino Aguilar testified that he performed an autopsy on James Taylor on July 7, 1982. He stated that Taylor had multiple missile injuries. He stated that the cause of death was a gunshot wound to the upper left chest which perforated the lungs and lacerated the aeorta. He stated that he recovered a bullet from the body and it was consistent with a bullet from a large caliber pistol. He further stated that Taylor had shotgun pellet injuries to his back.
Larry Gilliland testified that he was the Deputy Coroner for Winston County. He identified the body of James Taylor. He stated that Taylor had on a Winston County Sheriff's Department uniform. He further stated that Taylor's pistol was in his hand and had been fired twice.
Gary Wallace testified that he was a criminalist employed by the Alabama Department of Forensic Science. He was called to the Winston County Courthouse on July 7, 1982, and arrived there at approximately 5:30 a.m. He stated that he observed Deputy Taylor's body on the ground in the parking lot beside a sheriff's vehicle. He took pictures of the scene and processed it thoroughly.
Wallace found two spent 12 gauge shotgun shells. He recovered two projectiles lodged in the trunk lid of Taylor's patrol car, and one projectile lodged in the hood of the car. He recovered shotgun pellets lodged in the side of the vehicle.
Wallace further stated that he recovered a sawed-off shotgun. This gun was found *Page 358 
in a bushy area approximately two-tenths of a mile from the courthouse. There was a pair of brown gloves wrapped around the shotgun. Wallace processed an automobile found stuck in a mud-hole on a logging road. He stated that this automobile was a white Buick which had a dark top. He lifted a number of fingerprints from the Buick and items in the vehicle. He sent these fingerprints to John Mark Vaughn.
John Mark Vaughn testified that he was a fingerprint expert. He compared the latent prints submitted to him by Gary Wallace with known prints of the appellant. He stated that fourteen prints from the Buick automobile were identified as being made by the appellant. He also stated that both Billy Don Hass's and Bobby Miller's prints were found in the car.
Brent Wheeler testified that he was a firearms criminalist employed by the Alabama Department of Forensic Science. He received several fragments from Dr. Aguilar. He determined that the bullet fragments removed from Deputy Taylor were either fired from a .38 caliber or .357 caliber revolver type weapon.
He also received two Remington-Peters 12 gauge shot shells and one Remington 12 gauge shotgun from Gary Wallace. He ran a comparison test to see if the shells he received from Wallace had been fired from the 12 gauge shotgun submitted to him. He stated that this test was positive.
Billy Don Hass testified that he was in the Morgan County jail on theft charges when Bobby Miller and Janette Hanes posted bail for him on Monday afternoon, July 5, 1982. They left the jail and drove appellant's Buick Century back to Jimmy Miller's house. Upon arriving at Jimmy Miller's, with the appellant present, he began drinking beer. Later that evening, he and appellant had a conversation behind the trailer, in which the appellant discussed getting appellant's brother out of jail. Appellant told him there would only be one person at the jail — a lady. They were going to go in, tape her up, get appellant's brother out of jail and leave. The next morning and afternoon he just stayed at Jimmy Miller's trailer drinking beer. Then sometime after midnight he and the appellant left the trailer. Appellant was driving his Buick Century automobile. When they left the trailer, appellant was armed with a .32 caliber automatic pistol and Hass was armed with a 12 gauge sawed-off pump shotgun.
They arrived in Double Springs about 40 minutes later. They drove past "a Western Union or something and . . . saw an old gentleman and a police officer standing outside talking." They drove past "a couple of times," then "pulled up right there where they were at . . . and . . . throwed down on them and made them get in the trunk." Appellant and Hass then drove to the Winston County Jail. Appellant stopped the car a "good little piece from the steps," and they got out of the car and proceeded toward the jail door. At this point they saw a uniformed police officer standing outside his patrol car near the jail, and they yelled for the officer to freeze. Hass said that the officer began to shoot. Hass also stated that at this time he was armed with a 12 gauge sawed-off shotgun and appellant was armed with two pistols, one of which was a .357 magnum taken from the officer they locked in the trunk of the car.
When the officer began firing, the appellant ran toward the officer and there was an exchange of gunfire. Hass stated that he ran to the side of the car and fired two shots. Hass then ran to appellant's Buick and circled the block two or three times looking for the appellant. Unable to locate the appellant, Hass drove up the highway a few blocks, got out of the car and hid the shotgun up under some grass, then drove up a gravel road where the car got stuck. He got out and hitchhiked to Decatur, where he was arrested several days later.
The appellant presented an alibi defense. Terri Lynn Hass testified that she was married to Billy Don Hass, but she has not lived with him for six years. She had been living with Christopher Crowe, the appellant's brother, for about three years. She stated that she and Chris Crowe live in *Page 359 
Anahuac, Texas. She stated that she and Chris Crowe were in Alabama on the weekend of July 4, 1982. They had been to an island in Smith Lake and had been with the appellant. She stated that on July 5, 1982, she and Chris Crowe, along with the appellant, left Alabama at approximately 5:00 p.m., and drove straight to her home in Anahuac, Texas. She stated they arrived in Anahuac around 6:00 a.m., on Tuesday, July 6, 1982. She stated that the appellant stayed at her home until 4:30 a.m. on Wednesday, July 7, 1982, when he left to go to a friend's home outside of Houston, Texas.
Christopher Crowe testified to substantially the same facts as Terri Lynn Hass. He stated that the appellant was with them in Texas on July 6/7, 1982.
 I
The appellant contends that the trial court erred in admitting an oral statement made to F.B.I. agents by the appellant after he was arrested.
The statement which appellant contends was erroneously admitted into evidence was made by the appellant as he was being transported from the scene of his arrest to the Nashville jail. The record reveals that the appellant had been given hisMiranda warnings. The record further reveals that as the appellant was being transported to jail he initiated a conversation with the two F.B.I. agents in the car with him. (R. 597-598, 608). The appellant initially stated that he appreciated the agents not "blowing him away," and then indicated that someone else might have chosen to shoot him instead of his car tires. He then asked if he would be going back to Winston County. One of the agents told him that he would be going back "sometime down the road . . . to stand trial for the charges he was arrested for." (R. 608) He then made the statement that he "was afraid to go back there . . . because he might be mistreated or even killed by the local authorities there." (R. 608) The record indicates that one of the agents then made a comment to the effect that the officer in Winston County would have appreciated the appellant not shooting him. (R. 598) The appellant then stated that he could not bring him back or do anything about that now. (R. 598, 608)
A motion to suppress this statement was made by defense counsel, and after a hearing outside the presence of the jury such motion was denied.
It should be noted that a "voluntary, spontaneous statement made by a defendant to police officers, before any questions have been asked, is admissible against the defendant even though he has not been given his Miranda warnings." Jelks v.State, 411 So.2d 844 (Ala.Cr.App. 1981); Ervin v. State,399 So.2d 894 (Ala.Cr.App.), cert. denied, 399 So.2d 399 (Ala. 1981); Terry v. State, 397 So.2d 217 (Ala.Cr.App.), cert. denied, 397 So.2d 223 (Ala. 1981). This court has held on numerous occasions that voluntary statements, which are not the object of any threat or duress, are admissible. It is a well settled rule of law in Alabama that a statement made subsequent to arrest is prima facie involuntary and inadmissible at trial, and the State must demonstrate voluntariness and a Miranda
predicate in order to gain admission of the statement. Thomasv. State, 373 So.2d 1149 (Ala.Cr.App.), affirmed,373 So.2d 1167 (Ala. 1979); Eakes v. State, 387 So.2d 855 (Ala.Cr.App. 1978); Lewis v. State, 295 Ala. 350, 329 So.2d 599 (1976). "The voluntariness of a statement is, however, a question of law to be determined by the trial court upon preliminary proof and that court's decision will not be disturbed on appeal unless it appears contrary to the great weight of evidence, or is manifestly wrong." Balentine v. State, 339 So.2d 1063
(Ala.Cr.App.), cert. denied, 339 So.2d 1070 (Ala. 1976);Daniels v. State, 53 Ala. App. 666, 303 So.2d 166 (1974);Stewart v. State, 49 Ala. App. 681, 275 So.2d 360 (1973). See also, Snider v. State, 422 So.2d 807 (Ala.Cr.App. 1982); Billsv. State, 49 Ala. App. 726, 275 So.2d 706 (1973); Shewey v.State, 48 Ala. App. 730, 267 So.2d 520 (1972). *Page 360 
In the present case the appellant was not subject to any interrogation by law enforcement personnel. He had been advised of his Miranda rights and he initiated the conversation. Since the statement was not made as the result of any custodial interrogation, it is not inadmissible under the doctrine ofMiranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694
(1966). Further, such conversation did not amount to the "functional equivalent" of interrogation as proscribed in RhodeIsland v. Innis, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297
(1980).
There is ample evidence whereby the trial court could have determined that appellant's statement was voluntary. Thus, the trial court's decision on this matter must be upheld.
 II
The appellant contends that the trial court erred in instructing the jury on the appellant's failure to testify.
"Even where not requested a trial judge may instruct the jury on the legal effect of the accused's exercise of his constitutional right not to testify in his own behalf." Princev. State, 420 So.2d 856 (Ala.Cr.App. 1982); Tinsley v. State,395 So.2d 1069 (Ala.Cr.App.), cert. denied, 395 So.2d 1080
(Ala. 1981); Smith v. State, 370 So.2d 312 (Ala.Cr.App.), cert. denied, 370 So.2d 319 (Ala. 1979). However, this instruction should completely and clearly charge the jury that "the fact that the defendant did not testify could not be considered in determining guilt or innocence." Tucker v. State,429 So.2d 1165 (Ala.Cr.App. 1983).
In determining whether the trial court's charge to the jury in Tucker, supra, was erroneous, this court stated:
 "Although the defendant did not request the trial judge to instruct the jury as to his failure to testify, the trial judge did not err in giving such an instruction. Smith v. State, 370 So.2d 312, 316
(Ala.Cr.App.), cert. denied, 370 So.2d 319
(Ala. 1979), specifically noted that `a trial court's inclusion in its oral charge of a reference to failure of a defendant to testify in the case does not necessarily constitute error, even though the allusion to his not testifying was made without defendant's request and contrary to his expressed desire.' Smith held that `if an instruction as to the failure of the defendant to testify is given, without its being requested by the defendant, it should set forth completely and clearly as possible the protective feature to the defendant of the principle.' 370 So.2d 318. See also Tinsley v. State, 395 So.2d 1069 (Ala.Cr.App.), cert. denied, 395 So.2d 1080 (Ala. 1981)."
Tucker, supra at 1171. See also Prince v. State, 420 So.2d 856
(Ala.Cr.App. 1982).
The case sub judice is clearly distinguishable from Smith, supra. The court in Smith held that the oral charge was fatally defective because the trial judge only charged that "no inference can be drawn" from the defendant's failure to testify, and such language "de-emphasized the protective feature" that no adverse inference to the accused should be drawn from his failure to testify. Here, the trial judge charged the jury as follows: (R. 1410-1411)
 "Now, ladies and gentlemen, under the law of our land a person who is charged with a crime has an election which is guaranteed to him by the Fifth Amendment to the Constitution and the Amendment to the Constitution of the State of Alabama. That in essence states that he can not be compelled to be a witness against himself. It doesn't say that he can't testify. It simply says it is up to him to determine whether or not he will take the stand and testify in his own defense. Now the defendant, of course, in this case did not take the stand. And I charge you as a matter of law you can not consider the fact that he didn't take the stand as being any evidence of his guilt. You can't consider the reason that he didn't testify was he was scared to face jury or he was scared to face cross examination. You can only assume that he was exercising the constitutional right that he has not to be a witness against *Page 361 
himself. If he had elected to take the stand then he would be treated as any other witness. But that election is his. A criminal defendant who is charged in this country and in this State only has one obligation. That is, he must show up for his trial. He can walk in the courtroom, set down, and he doesn't have to prove anything because under the law of our land the State who brings the charges must bring the evidence to show to you beyond a reasonable doubt and to a moral certainty that the defendant is not guilty. The defendant has no burden of proving anything in a criminal case. That's not only in this state but that's anywhere in this country."
A careful reading of this charge discloses that such was neither prejudicial to the appellant nor capable of misleading the jury into drawing any adverse influence from the appellant's failure to testify. See Smith v. State, supra;Tucker v. State, supra; Prince v. State, supra. The trial court did not err in giving the instruction in this instance. He properly included the protective features of the charge and made no negative comments concerning appellant's failure to take the stand.
 III
The appellant contends that he was denied the effective assistance of counsel during trial of his case and urges reversal on these grounds. He specifically argues: (1) that defense counsel did not poll the jury upon its returning a verdict of guilt; (2) that defense counsel was responsible for co-defendant Hass's decision to testify against appellant; and (3) that defense counsel would not allow appellant to take the stand in his own behalf.
In Duncan v. State, 461 So.2d 906 (Ala.Cr.App. 1984), Judge Bowen opined that "[i]n Strickland v. Washington, 466 U.S. 668,104 S.Ct. 2052, 2064-65, [80 L.Ed.2d 674] (1984), the United States Supreme Court held that `the proper standard for attorney performance is that of reasonably effective assistance.'" He further stated that "[t]he Sixth Amendment does not require errorless counsel or counsel judged ineffective by hindsight. Hoppins v. State, 440 So.2d 1125,1127 (Ala.Cr.App. 1983)."
Judge Bowen further stated in Duncan that an appellant's counsel's performance must be shown to have prejudiced his defense. "The appropriate test for prejudice is stated inStrickland, 104 S.Ct. at 2068: `The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" Duncan v.State, supra. "In making a determination of prejudice, this Court must consider `the totality of the evidence before the judge or jury.' Strickland, 104 S.Ct. at 2069." Id.
Moreover, "[a]n adequate defense in the context of the constitutional right to counsel does not mean that counsel will not commit what may later prove to be tactical errors, and matters of trial strategy, in the absence of a clear showing of improper or inadequate representation, will be left to the judgment of trial counsel. Bridges v. State, 391 So.2d 1086,1091 (Ala.Cr.App. 1980)." Duncan v. State, supra.
A review of the transcript in this case indicates that the instances appellant alleges constitute inadequate representation were either not prejudicial to his cause (as in the case of failing to poll the jury), unsupported by the record, or clearly matters of trial strategy. The record reveals that defense counsel told co-defendant Hass that neither he nor the appellant wanted Hass to testify. The record further reveals that counsel talked with the appellant many times about appellant testifying, but that appellant was never told not to take the stand.
Not only has the appellant failed to establish that the conduct of trial counsel had reduced the trial proceeding to a "farce, sham, or mockery," Robinson v. State, 361 So.2d 1172
(Ala.Cr.App. 1978), but he has also fallen far short of establishing that he *Page 362 
was denied "reasonably effective" assistance of counsel as set forth in Strickland. See Harris v. Oliver, 645 F.2d 327 (5th Cir. 1981); Mitchum v. State, 414 So.2d 168 (Ala.Cr.App. 1982);Phelps v. State, 439 So.2d 727 (Ala.Cr.App. 1983). "There is no reason for this Court to believe that `counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result' — the `benchmark for judging any claim of ineffectiveness.' Strickland, 104 S.Ct. at 2064." Duncan v.State, supra. See also, Ex parte Daniel, 459 So.2d 948 (Ala. 1984).
 IV
The appellant contends that the trial court committed reversible error by its failure to instruct the jury that the capital offense of murder of a police officer requires knowledge by the defendant of the officer's status. Appellant argues that this court must reverse on the basis of the Alabama Supreme Court decision in Ex parte Murry, 455 So.2d 72 (Ala. 1984).
In Murry the Court opined that failure to charge on this element is reversible error. However, the case sub judice is distinguishable from Murry. In Murry, the issue of knowledge was one for the jury when the defendant testified at trial that he did not know that the persons he shot were law enforcement officers. In the present case no lack of knowledge was ever claimed, the appellant relied on an alibi defense.
Further, in the present case, the fact that the victim was a law enforcement officer was undisputed and shown conclusively by evidence elicited during trial. The victim was in uniform and sitting in a marked patrol car in front of the jail. The issue of knowledge was not before the jury.
Moreover, "[a]n instruction which ignores, or omits to charge on, a material issue or element of the case is not grounds for reversal if accused is not prejudiced thereby, as where no other verdict than that of guilty is warranted by the evidence, where the issue or element ignored is shown conclusively by the evidence, where the omission is with respect to facts not supported by the evidence, or where the error is remedied by other instructions given." 24 B, C.J.S., § 1922 (9) (1962).
In Ritter v. Smith, 568 F. Supp. 1499 (D.C.Ala. 1983), the court held that "[u]nder Alabama law, an error of omission (failure to charge on a necessary point) in the oral charge to the jury is waived unless a timely and specific objection is made to it in the trial court." The court further stated that:
 "Such errors are waived unless a proper written requested instruction is tendered to the trial court on the omitted point: `Where a party desires the court to extend its oral charge to cover some applicable law in the trial of a case, his remedy is to request a written charge on the subject, which if refused would protect the record and present the matter for Appellate Courts. . . . A failure to pursue . . . the [remedy] above set out, if proper and applicable to the case, is a waiver of a review by this court as to the matters in question.'
 Parham v. City of Opelika, 412 So.2d 1268, 1269
(Ala.Cr.App. 1982) (citing Yates v. State, 390 So.2d 32, 35 (Ala.Cr.App. 1980)). See also Miller v. State, 405 So.2d 41, 47 (Ala.Cr.App. 1981)."
Ritter, 568 F. Supp. at 1518.
The appellant did not follow the procedures outlined above as required by Alabama law. In the instant case it is abundantly clear that no injury resulted from the trial court's omission. Rule 45A, A.R.A.P.
 V
Appellant argues that allowing the victim's widow to sit at the counsel table with the prosecutor violated his constitutional rights. A review of the record indicates that the victim's widow conducted herself in an exemplary manner during the trial. At one point during the trial she did begin to cry and the appellant renewed his objection *Page 363 
to her sitting at the counsel table. It should be noted that at the time Mrs. Taylor began to cry, the pathologist who performed the autopsy on her husband was describing in graphic detail the findings of the autopsy. An in-chamber hearing was held in which the trial judge refused to remove her from the counsel table. Appellant's counsel then requested a short recess in order for her to compose herself and this request was granted. The record does not indicate any further incidences of this nature.
Alabama Code § 15-14-53 (1975), provides that "[t]he victim of a criminal offense shall be entitled to be present in any court exercising any jurisdiction over such offense and therein to be seated at the counsel table of any prosecutor prosecuting such offense or other attorney representing the government or other persons in whose name such prosecution is brought."
Alabama Code § 15-14-56 (a) (1975), provides that "[w]henever a victim is unable to attend such trial or hearing or any portion thereof by reason of death; . . . or other inability, the victim, the victim's guardian or the victim's family may select a representative who shall be entitled to exercise any right granted to the victim, pursuant to the provisions of this article."
It is clear that Mrs. Taylor had a right to be seated at the prosecutor's table. In view of this right and the fact that the record indicates no prejudice from the trial court's allowing her to be present, we must agree with the trial court on this matter. No constitutional rights of the appellant were abridged because of this one incident. Brodka v. State, 53 Ala. App. 125,298 So.2d 55 (1974).
 VI
The appellant contends that the Alabama Death Penalty Act is constitutionally defective. He raises a number of issues regarding the alleged constitutional defects and urges this court to reverse his conviction on the basis of these contentions.
 (A)
Appellant first argues that the advisory nature of the jury's sentence verdict under § 13A-5-46, Code of Alabama 1975, violates Article I, Section 11 of the Alabama Constitution of 1901.
Article I, Section 11 provides "[t]hat the right of trial by jury shall remain inviolate." This provision has remained virtually unchanged since the first state constitution was adopted in 1819. Article I, Section 11, draws its meaning from that early history. See Mayor of Mobile v. Stonewall InsuranceCo, 53 Ala. 570 (1875); State v. Alabama Power Company,254 Ala. 327, 48 So.2d 445 (1950).
The Supreme Court of Alabama opined in Mayor of Mobile v.Stonewall Insurance Co., supra, that "[a] state constitution is always interpreted in light of the common law, and if it be not the first constitution, in light of its predecessors." The Court further stated that "[t]he guarantees for the security of property and of personal liberty, found in the bill of rights, are borrowed chiefly from magna charta, and for their interpretation we look to the common law. . . ." Mayor ofMobile, 53 Ala. at 577. Thus, the purpose of this provision is to preserve the right to trial by jury as it existed in the English common law, and such is not intended to extend the right of trial by jury beyond that which existed prior to the Constitution.
In the present case, we must direct our inquiry as to whether there existed any common law right to have the jury determine the punishment in a criminal case. A review of leading authorities reveals that at common law the jury had no input into the sentencing decision. 1 Bishop's New CriminalProcedure, § 43, p. 20 (1913); IV Blackstone's Commentaries, pp. 354-355, 366-369, 371 (1st ed. Reprint). See also Corlew v.State, 181 Tenn. 220, 180 S.W.2d 900 (1944).
Jury participation in sentencing was provided by statute in Alabama beginning in 1841. Such statute provided for the jury to determine the sentence for certain crimes, including murder. See Meek's Supplement *Page 364 to Aiken's Digest of the Laws of Alabama, p. 210 (1841). This statute was in existence when the current state constitution was adopted in 1901. We must determine whether the current constitution incorporated the statutes conferring sentencing authority on the jury. A review of how other states have handled this situation reveals that similarly worded state constitutional provisions did not incorporate nineteenth century statutes providing for jury sentencing. Such provisions only seek to preserve the traditional jury function of determining guilt or innocence. See George v. People, 167 Ill. 447, 47 N.E. 741 (1897); State v. Hamey, 168 Mo. 167,67 S.W. 620 (1902); Woods v. State, 130 Tenn. 100, 169 S.W. 558 (1914);Ex parte Moser, 602 S.W.2d 530 (Tex.Cr.App. 1980); State v.Reynolds, 608 S.W.2d 422 (Mo. 1980). We must agree with the above authorities and hold that Article I, Section 11, confers the right of trial by jury as existed at common law and the time of Alabama's first state constitution. This provision did not incorporate the statutes conferring sentencing authority upon the jury which were in force at the time of the adoption of the 1901 Alabama Constitution.
Since the jury had no role in sentencing at common law, no such role is required by the original or any subsequent embodiment of the inviolability clause. Therefore, the advisory nature of the jury's sentence verdict under § 13A-5-46, Code of Alabama 1975, is not violative of Article I, Section 11.
 (B)
Appellant contends that the advisory nature of the jury's sentence verdict violates the Due Process Clause.
In Spaziano v. Florida, 468 U.S. 447, 104 S.Ct. 3154,82 L.Ed.2d 340 (1984), the United States Supreme Court upheld against attack on due process grounds the trial court's override of a jury sentence under Florida's capital murder statute. It should be noted that Florida's capital murder statute is very similar to Alabama's statute. The Court stated that "[i]n light of the facts that the Sixth Amendment does not require jury sentencing, that the demands of fairness and reliability in capital cases do not require it, and that neither the nature of, nor the purpose behind, the death penalty requires jury sentencing, we cannot conclude that placing responsibility on the trial judge to impose the sentence in a capital case is unconstitutional." Spaziano,104 S.Ct. at 3165.
In view of the foregoing authority, we hold that the advisory nature of the jury's sentence verdict is not violative of the Due Process Clause.
 (C)
Appellant contends that the process for weighing the aggravating and mitigating circumstances, provided in §13A-5-48, Code of Alabama 1975, is vague and indefinite and, therefore, in violation of due process.
The United States Supreme Court addressed a similar argument in Proffitt v. Florida, 428 U.S. 242, 96 S.Ct. 2960,49 L.Ed.2d 913 (1976). The Florida statute which the Court reviewed is quite similar to the Alabama statute now under attack. InProffitt the Supreme Court held that "[w]hile the various factors to be considered by the sentencing authorities do not have numerical weights assigned to them, the requirements ofFurman (v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346
(1972)), are satisfied when the sentencing authority's discretion is guided and channeled by requiring examination of specific factors that argue in favor of or against imposition of the death penalty, thus eliminating total arbitrariness and capriciousness in its imposition." Profitt, 428 U.S. at 258,96 S.Ct. at 2969. The Court further stated that the directions given to the judge by the statute were "sufficiently clear and precise to enable the various aggravating circumstances to be weighed against the mitigating ones." Proffitt,428 U.S. at 258, 96 S.Ct. at 2969. In conclusion, the Court stated that Florida had "responded to Furman by enacting *Page 365 
legislation that passes constitutional muster." Proffitt,428 U.S. at 259, 96 S.Ct. at 2970.
In view of the foregoing authority, and after a review of our statute and the Florida statute which we find to be very similar, see Fla.Stat.Ann. § 921.141 (West 1983), we hold that the procedure provided by § 13A-5-48, Code of Alabama 1975, is not vague and indefinite. The Alabama provision sufficiently guides and directs the trial court's sentencing discretion by requiring them to focus on the circumstances of each case and the defendant in determining whether the death penalty is to be imposed. Further, the judge and jury are required to look at specific factors that argue in favor of or against the imposition of the death penalty. The procedure is constitutionally sound.
 (D)
Appellant further argues that the capital murder statute is unconstitutional because it permits the trial court to override the jury's sentence recommendation.
This contention has been authoritatively answered against appellant. Ex parte Jones, 456 So.2d 380 (Ala. 1984); Ex parteLindsey, 456 So.2d 393 (Ala. 1984); Spaziano v. Florida,468 U.S. 447, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984).
 VII
The appellant contends that the trial court erred in admitting the in-court identification of him by prosecution witness Irving Gilbreath. Appellant argues that the identification of him was tainted and, therefore, inadmissible.
A review of the record reveals that, on the day that Officer Taylor was killed, Gilbreath viewed a lineup in Decatur, Alabama. The appellant was not in this lineup, but Gilbreath told the police that a man in the lineup was similar in appearance to the man who was holding the pistol. Some twelve months later Gilbreath attended another lineup in Birmingham, Alabama. He picked the appellant out of this lineup and stated he was the man with the pistol. He testified at trial that he had seen pictures of the appellant on television, but he was unsure whether this was before or after he identified appellant. Gilbreath made an in-court identification of the appellant and stated that he was certain appellant was the man that had the pistol. He further stated that he had a good opportunity to view the appellant's face during the time appellant was putting him in the trunk of the police car.
"Whether an in-court identification has been so tainted by an extrajudicial identification as to vitiate the in-court identification is not to be determined solely by the circumstances of the extrajudicial identification, but all of the circumstances relative to the identification of defendant by the witness are to be taken into consideration, and if it is determinable therefrom that an in-court identification was independent of the extrajudicial identification, evidence of the in-court identification is admissible. Matthews v. State,361 So.2d 1195 (Ala.Cr.App. 1978); Dill v. State, 429 So.2d 633
(Ala.Cr.App. 1982); Raines v. State, 428 So.2d 206 (Ala.Cr.App. 1983)." Miller v. State, 431 So.2d 586, 590 (Ala.Cr.App. 1983).
In Neil v. Biggers, 409 U.S. 188, 93 S.Ct. 375,34 L.Ed.2d 401 (1972), the United States Supreme Court listed several factors which should be considered when determining whether an in-court identification has an independent basis. "[T]he factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness's degree of attention, the accuracy of the witness's prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." Neilv. Biggers, 409 U.S. at 199-200, 93 S.Ct. at 382.
Taking all of these factors into account in this case, it is clear that Gilbreath's identification of the appellant was made on an independent basis. The identification was, therefore, admissible. *Page 366 
 VIII
The appellant contends that he was denied his right to compulsory process when William Ray Stevens did not testify at trial.
The record reveals that Stevens, a young man approximately 16 years of age, was living "just below the courthouse" in Double Springs at the time that Deputy Taylor was killed. Stevens gave a statement to an investigator with the Alabama Bureau of Investigation. This fact was known by defense counsel for several months before trial.
The record further shows that the State issued a subpoena for Stevens. An effort was made to locate this witness by Winston County Sheriff's Deputies. They searched the county following several leads as to Stevens's location until they finally ran out of information and Stevens could not be located. On the second day of trial defense counsel caused another subpoena to be issued for Stevens. This subpoena was not served.
Defense counsel was allowed to have the contents of Stevens's statement read into evidence by the officer who interviewed Stevens.
Stevens was finally located and attended the motion for new trial hearing. His testimony at this hearing was substantially the same as the statement which was read into evidence during trial. Stevens further revealed that during the time that the Winston County Sheriff's Department was looking for him, he was living in Texas.
"Before it can be said that the accused has been denied this constitutional right (to compulsory process), he must apply to the court for the issuance of an attachment and show to the court that the witness has been served with a subpoena a sufficient length of time before the trial to afford an opportunity to the witness to obey its mandate, that the witness is within the jurisdiction of the court, and that his attendance can be obtained within a reasonable time by the compulsory process, that such witness is absent without the procurement or consent of the accused, and that the testimony of the witness is material. . . ." Thomas v. State, 15 Ala. App. 408, 73 So. 558 (1916); Weaver v. State, 401 So.2d 344
(Ala.Cr.App. 1981).
In this case the appellant did not issue a subpoena until the second day of trial. It was not shown that the witness was within the jurisdiction of the court. In fact, the testimony was that this witness could not be found. Further, defense counsel never moved for a continuance in order to procure the witness' attendance. Although defense counsel did show that Stevens's testimony was material, he did not follow the other procedures outlined above, and the statement of Stevens was allowed into evidence due to Stevens's absence. We fail to see how the appellant's right to compulsory process was violated in this instance.
 IX
The appellant contends that the admission of his brother's indictment for capital murder into evidence at the sentence phase was prejudicial to appellant and as a result he should be granted a new trial.
The State was entitled to prove the aggravating circumstances at the sentence phase of the trial. In such case the State had to show that the appellant's brother was in jail awaiting trial and the appellant was attempting to break him out of jail. During the guilt phase of the trial there was evidence elicited from several witnesses that the appellant was going to attempt to break his brother out of jail. The indictment was merely further proof of the fact that appellant's brother was in jail awaiting trial for capital murder.
Moreover, the indictment had a bearing on the appellant's motive and intent for going to the jail on the night in question. "As observed in Jarrell v. State, 35 Ala. App. 256,50 So.2d 767: `In the case of Earnest v. State, 21 Ala. App. 534,109 So. 613, 614, this court said: "as to showing a motive for the commission of an offense, the law says it is not necessary in order to prove the crime; but evidence of motive is *Page 367 
always admissible. In other words, it is permissible in every criminal case to show that there was an influence, an inducement, operating on the accused, which may have led or tempted him to commit the offense. . . . The extent or magnitude of such motive, whether great or small, is also a proper inquiry. The rulings of the court upon this subject are free from reversible error."'" Hardy v. State, 51 Ala. App. 489,286 So.2d 899 (1973); Bynum v. State, 348 So.2d 804
(Ala.Cr.App. 1976), writ quashed, 348 So.2d 828 (Ala. 1977). In the present case the appellant was not prejudiced by the introduction of this evidence and the trial court did not err in admitting such evidence.
 X
The appellant contends that the trial judge improperly sentenced him to death in spite of the jury's recommendation of life without parole. Appellant advances several arguments as to why such override was impermissible.
 (A)
Appellant argues that the trial court did not consider evidence of nonstatutory mitigating circumstances. He relies upon Herzog v. State, 439 So.2d 1372 (Fla. 1983), and urges reversal on this point.
Appellant's reliance on Herzog in this case is erroneous. InHerzog the defendant offered evidence to prove nonstatutory mitigating circumstances. The trial judge's sentencing order did not indicate that the court considered this evidence. In the case sub judice, the trial court considered the evidence of nonstatutory mitigating circumstances advanced by the defendant and did not find such evidence to be mitigating. (R. 1993) Thus, no reversal is required on this point, as it was inHerzog.
 (B)
Appellant argues that unless the trial court has facts before it which the jury did not have, a jury override is erroneous. He again relies upon Herzog for this proposition. This argument is based on Florida law and the rule announced by the Florida courts in Tedder v. State, 322 So.2d 908 (Fla. 1975). Such a rule is not the law in Alabama and this argument has been authoritatively answered by the Alabama Supreme Court in Exparte Arthur Jones, 456 So.2d 380 (Ala. 1984).
 (C)
Appellant further argues that the trial court erred in finding the aggravating circumstance contained in § 13A-5-49
(5), Code of Alabama 1975, because it is the same aggravating circumstance as contained in the capital charge against appellant.
The appellant was charged under § 13A-5-40 (a)(5), Code of Alabama 1975. Such provision is as follows:
 "(5) Murder of any police officer, sheriff, deputy, . . . while such officer or guard is on duty or because of some official or job-related act or performance of such officer or guard,. . . ."
The aggravating circumstances contained in § 13A-5-49 (5), Code of Alabama 1975, is as follows:
 "(5) The capital offense was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody."
A review of these provisions indicates that they very well may apply to the same set of circumstances; however, they do not constitute the same aggravating circumstance.
 (D)
Appellant finally argues that the court erred in finding that § 13A-5-49 (5), Code of Alabama 1975, applies to this case. He advances the argument that such provision relates to committing the offense for the purpose of effecting one's own escape from custody.
In deciding this issue we must look to the plain language of the statute. The statute reads "effecting an escape." *Page 368 
Where plain language is used, the statute must be interpreted to mean exactly what it says. Ex parte Madison County,406 So.2d 398, 400 (Ala. 1981). A careful reading of the statute indicates that it does not limit its application to effecting one's own escape. The trial court properly found such aggravating circumstance to exist.
 XI
As required by § 13A-5-53 (a), Code of Alabama 1975, this court must review the propriety of the imposition of the death penalty in this case. Our review must include a determination of the following questions:
 (1) Was any error adversely affecting the rights of the defendant made in the sentence proceedings?
 (2) Were the trial court's findings concerning the aggravating and mitigating circumstances supported by the evidence?
(3) Was death the proper sentence in this case?
As to the first question, we have reviewed the sentence proceedings and have found no error adversely affecting the defendant's rights. We are also satisfied that the trial court's written findings concerning the aggravating and mitigating circumstances are fully supported by the evidence.[2]
To answer the question of whether the death penalty was properly imposed in this case, we must determine:
 (1) Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor;
 (2) Whether an independent weighing of the aggravating and mitigating circumstances at the appellate level indicates that death was the proper sentence; and
 (3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.
Alabama Code § 13A-5-53 (b) (1975); see also Beck v. State,396 So.2d 645 (Ala. 1981).
There is nothing in the record before us which even intimates that the death penalty was imposed under the influence of passion, prejudice, or any other arbitrary factor.
Our independent weighing of the aggravating and mitigating circumstances leaves us with no doubt that the death penalty was appropriate in this case. Our review of this case reveals two aggravating circumstances: (1) the defendant committed the offense for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody, § 13A-5-49 (5), Code of Alabama 1975; and (2) the defendant committed the offense to disrupt or hinder the lawful exercise of governmental function or the enforcement of laws, § 13A-5-49
(7), Code of Alabama, 1975. Our review discloses that no statutory mitigating circumstances exist. We have further considered the testimony offered by the defendant as evidence of non-statutory mitigating circumstances and conclude that this evidence is not mitigating. As a result of this inquiry we find that the mitigating circumstances did not outweigh the aggravating circumstances.
In regard to the final determination this court must make, we find that the death penalty imposed on the defendant is not excessive or disproportionate to the penalty imposed in similar cases. See e.g., Harrell v. State, 470 So.2d 303 (Ala.Cr.App. 1984); Daniel v. State, 459 So.2d 933 (Ala.Cr.App.), remanded with instructions, Ex parte Daniel, 459 So.2d 942 (Ala. 1982), on return to remand, affirmed, Daniel v. State, 459 So.2d 944
(Ala.Cr.App.), affirmed, Ex parte Daniel, 459 So.2d 948 (Ala. 1984); Dobard v. State, 435 So.2d 1338 (Ala.Cr.App. 1982), affirmed, 435 So.2d 1351 (Ala. 1983), cert. denied,464 U.S. 1063, 104 S.Ct. 745, 79 L.Ed.2d 203 (1984); Magwood v. State,426 So.2d 918 (Ala.Cr.App. *Page 369 
1982), affirmed, 426 So.2d 929 (Ala. 1983), cert. denied,462 U.S. 1124, 103 S.Ct. 3097, 77 L.Ed.2d 1355 (1983).
We have searched the record as required by Rule 45A, A.R.A.P., and have found no error which adversely affected the rights of the appellant. The sentence of death was proper in this case. Therefore, the judgment of the trial court is due to be and is hereby, affirmed.
AFFIRMED.
All the Judges concur.
[1] See footnote on page 368.
[2] The trial court's order and judgment at the sentencing hearing is hereto attached as Appendix A (R. 1988-1995)
 APPENDIX A
 IN THE CIRCUIT COURT FOR JEFFERSON COUNTY, ALABAMA. STATE OF ALABAMA, Plaintiff, VS. COY PATRICK CROWE, Defendant. CASE NO. CC-83-2727 SENTENCING ORDER
Coy Patrick Crowe stands convicted by a jury of his peers of the Capital Offense, Murder of a Winston County Sheriff's Deputy (Jim Taylor) in violation of the Alabama Code, Title13A-5-40 (a)(5).
In a separate sentencing phase, the same jury returned its advisory verdict that defendant be sentenced to life imprisonment without parole.
On January 6, 1984, the Court held the sentencing hearing mandated by Title 13A-5-47. Defendant was allowed to present evidence that he deemed appropriate and argument was presented by the State and defendant.
Prior thereto a pre-sentence report was ordered and made a part of the record in this case. Counsel for defendant and defendant were given ample opportunity to examine the report for inaccuracies and no part of the pre-sentence investigation and report has been or shall be kept confidential. The pre-sentence investigation ordered herein was deemed to be substantially correct and was accepted as part of the evidence in this case.
The Court has considered the pre-sentence report as to the background of the defendant and as to other information in the report which is prescribed by law or court rule for felony cases generally. The Court however has made its own independent analysis of the existence or non-existence of aggravating and mitigating circumstances. The Court has made its own special application of the facts which the Court has heard and has carefully reviewed the enumerated aggravating circumstances and mitigating circumstances whether enumerated or not.
At the sentence hearing, the State's attorney urged the Court to reject the recommendation of the jury and fix defendant's punishment at death. Defendant through counsel has argued to the Court that the recommendation of the Jury as to its advisory verdict should be the proper Judgment of the Court.
 I SUMMARY OF THE CRIME AND DEFENDANT'S PARTICIPATION
The evidence in this cause shows that sometime prior to July 7, 1982, that Coy Patrick Crowe, the defendant herein, began the planning and preparation of a plot to remove his brother, Billy Crowe, who was at that time being held in the Winston County Jail on the capital offense of murder during robbery.
The evidence further shows that Coy Patrick Crowe made contacts to several individuals who declined to aid him in his illegal venture and finally he secured the services of Billy Don Hass who was then being held in the Morgan County Jail on a charge and that subsequent to having the said Billy Don Hass released from the Morgan County Jail they proceeded to finalize the plans to remove by force, illegally, Coy Patrick Crowe's brother, Billy Crowe, from the legal incarceration at the Winston County Jail, Double Springs, Alabama.
On July 7, 1982 at approximately 1:30 a.m., Coy Patrick Crowe and a co-defendant in this case, Billy Don Hass, left the *Page 370 
residence of Jimmy Dean Miller in Helican enroute to the Courthouse in Double Springs. They were going to the Winston County Jail to remove Coy Patrick Crowe's brother, Billy Crowe, from the Jail. Billy Crowe was being held there on the Capital Offense of Murder During Robbery. They were traveling in Coy Patrick Crowe's automobile, a 1973 Buick. Billy Don Hass was armed with a .12 gauge sawed-off shotgun and Coy Patrick Crowe had a .32 caliber pistol. They drove to the Winston County Courthouse in Double Springs, Alabama, and checked to see if there was a Deputy Sheriff on duty. They did not see one and then circled through the Town and observed Double Springs Policeman, Hobbie Walker, at the Sanitation Department which is located one block South of the Courthouse in Double Springs. Coy Patrick Crowe and Billy Don Hass approached the Double Springs Policeman, Hobbie Walker, and the Guard at the Sanitation Department, Irvin Gilbreath, drew their guns on them and forced them into the trunk of the police car. Coy Patrick Crowe took Hobbie Walker's police service revolver, a .357 magnum pistol at that time. Coy Patrick Crowe and Billy Don Hass then got into Coy Patrick Crowe's automobile and drove it to the vicinity of the Winston County Courthouse in Double Springs, there parking the automobile and both exiting said car. Coy Patrick Crowe and Billy Don Hass then made their approach to the Winston County Jail which is located inside the Courthouse. As they made their approach to the jail along the east side of the courthouse, they then noticed Deputy Jim Taylor of the Winston County Sheriff's Department standing beside his patrol car which carried the normal markings of patrol cars operated by Sheriffs' Departments in this part of the State of Alabama.
The evidence further shows that Coy Patrick Crowe shouted to Deputy Taylor to freeze at which time Deputy Taylor pulled his weapon and fired at Coy Patrick Crowe and Billy Don Hass. Billy Don Hass, the evidence shows in this cause, ran to the right and got behind the car and that Coy Patrick Crowe, with a pistol in each hand, ran toward the patrol car firing each of these pistols. The evidence further shows that Billy Don Hass, the co-defendant herein, fired two shots with a shotgun at the Deputy's car then turned and ran from the scene. The evidence further shows that Coy Patrick Crowe fired twice into the trunk of the Deputy's car and then ran between the water tank and the Deputy's car and fired a shot through the window opposite the driver's side. The evidence further shows that the shot from the pistol hit the steering wheel, wounding Deputy Taylor in his index finger and then struck Deputy Taylor in the left side of the chest. The evidence further shows by way of the toxicologist who testified in this cause that the cause of death in this matter was the shot to the left side of the chest which instantaneously produced the death of Deputy Jim Taylor. The evidence further shows that upon the sound of gunfire the dispatcher who was located inside the Winston County Jail immediately telephoned investigator Jack Gilliland who was employed by the Winston County Sheriff's Department and informed him of the altercation outside the jail and courthouse. The evidence further shows that the investigator immediately came to the Winston County Courthouse and as he made his approach there he observed Deputy Taylor's patrol car with the windows shot out and the door open and further that he found Deputy Taylor crouched on his face beside the driver's door, pistol in his hand, and Deputy Taylor was dead on his arrival.
The evidence in this cause further shows that following the shooting, that Double Springs Policemen Hobbie Walker and Irvin Gilbreath were released from the trunk of the Double Springs Police Department's patrol car and that he, together with investigator Gilliland and other law enforcement officers, proceeded to Helican to the residence of Jimmy Dean Miller and there questioned those persons who were assembled at that residence and therefound further that Coy Patrick Crowe and Billy Don Hass had prior to this time left the residence which was also in Winston County, *Page 371 
Alabama, enroute to the Winston County Jail to secure the release of Billy Crowe from the Winston County Jail.
Evidence further shows that subsequent to the investigation that a warrant was obtained charging Coy Patrick Crowe, the defendant herein, and Billy Don Hass, for the capital offense of Murder of a Police Officer while on active duty.
The evidence in this case further shows that Billy Don Hass has been continuously held in the jurisdiction of law enforcement officers pending his trial on the charges returned by the Winston County Grand Jury. The evidence further shows that it was approximately six months before Coy Patrick Crowe was arrested on the charges for which he stands convicted today and in fact the evidence in this case shows that he was arrested on a fugitive warrant which was secured by the State of Alabama and which was executed by FBI agents and he was taken into custody at Shoney's Restaurant in Nashville, Tennessee.
The evidence further shows that at the time of his arrest by the FBI agents in Nashville, Tennessee, that he attempted to leave the scene and that the officers in fact used their weapons to shoot out the front tires of his automobile.
The evidence further shows that defendant was returned to the State of Alabama and has been held in continuous confinement up to the date of his trial.
 II AGGRAVATING CIRCUMSTANCES Title 13A-5-49, Code of Alabama
In determining what would be a proper punishment for this defendant, the Court has considered and made the following findings on the enumerated aggravating circumstances specified in the above cited statute.
The Court specifically finds here that:
1. The capital offense was not committed by a person under sentence of imprisonment.
2. The Court specifically finds that the defendant has not been previously convicted of another capital felony involving the use or threat of violence to the person.
3. The Court specifically finds that the defendant did not knowingly create a great risk of death to many persons.
4. The Court specifically finds that the capital offense was not committed while defendant was engaged or was an accomplice in the commission of or an attempt to commit or flight after committing or attempting to commit rape, robbery, burglary or kidnapping.
5. The Court finds from the evidence in this cause beyond a reasonable doubt and to a moral certainty that the capital offense was committed for the purpose of avoiding or preventing a lawful arrest or effecting the escape from custody in this case of Billy Crowe, the defendant Coy Patrick Cr owe's brother, who was being held in the Winston County Jail to answer an indictment for the capital offense of Murder during Robbery.
6. The Court specifically finds that the capital offense was not committed for pecuniary gain.
7. The Court finds from the evidence beyond a reasonable doubt and to a moral certainty that the capital offense was committed to disrupt or hinder the lawful exercise of a governmental function or the enforcement of law in that the defendant in this cause, Coy Patrick Crowe, through force and violence, attempted to take jurisdiction of the Winston County Jail from the legally constituted authorities and remove therefrom a prisoner who was being held legally to answer to the capital charge of murder committed during the commission of robbery.
8. The Court finds specifically from the evidence that the capital offense was not especially heinous, atrocious or cruel compared to other capital offenses.
 III MITIGATING CIRCUMSTANCES Title 13A-5-51, Code of Alabama
Mitigating circumstances which the Court has considered during the sentencing *Page 372 
hearing are all of those enumerated in Title 13A-5-51, Code of Alabama, and are as follows:
1. The Court finds as a matter of fact and law from the evidence in this cause that the defendant has a significant history of prior criminal activity.
2. The Court specifically finds that the capital offense was not committed while the defendant was under the influence of extreme mental or emotional disturbance.
3. The Court specifically finds that the victim was not a participant in the defendant's conduct nor consented to it.
4. The Court specifically finds that the defendant was not an accomplice but to the contrary was the main actor in the capital offense committed in this instance and further, that his participation was as a lead person in carrying out the acts made the basis of this offense.
5. The Court specifically finds that the defendant did not act under extreme duress or under the substantial domination of another person.
6. The Court specifically finds there was no evidence of defendant's failure to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law or that his ability to conform his conduct was substantially impaired.
7. The Court specifically finds that the age of the defendant at the time of the commission of the crime is not a mitigating circumstance.
In addition to the foregoing circumstances enumerated under Title 13A-5-51, the Court, in accordance with the requirements of Title 13A-5-52, has considered all aspects of the defendant's character and record and all aspects of the environment in which he was raised and the evidence offered with reference to the claim by his counsel of his deprived childhood and his lack of community and family stability in his growing up, and after consideration of all these factors, the Court finds that there are no mitigating circumstances contained as such in any of these offers of proof and the Court declines to declare and find that this is a mitigating circumstance in the defendant's conduct made the basis of this charge and his subsequent conviction.
It is further the finding of the Court that in review of the advisory verdict recommending life without parole returned by the jury in this cause, the Court has determined from its consideration of the recommendation of life without parole, that in order for the jury to return this recommendation the jury had to view the evidence in one of two lights:
1. They had to find that the State of Alabama had failed to prove that the commission by this defendant of the crime for which he stands convicted was not committed under any of the enumerated aggravating circumstances as set out in Title13A-5-49 or on contrary that they did find that he did commit the crime for which he was convicted under one or more aggravating circumstances and further that in considering the mitigating circumstances which is required in Title 13A-5-51, the jury finds from the evidence offered by defendant that defendant committed the crime for which he stands convicted but that there were one or more mitigating circumstances and further the mitigating circumstances out weigh the aggravating circumstances found as a matter of fact, hence the recommendation that the Court sentence this defendant to life without parole.
The Court, after consideration of all the facts, finds specifically that on the offer of the State of Alabama with reference to aggravating circumstances; numbers 5 and 7 were proven. The Court further finds that based on this finding in order for the Court to sentence the defendant to life without parole the Court must find that there were mitigating circumstances which were proven in the sentencing phase of this trial and further that those mitigating circumstances proven out weigh the aggravating circumstances which the Court has referred to above.
The Court finds from its consideration of the evidence offered with reference to mitigating circumstances that there were none *Page 373 
shown nor proven; and based on the finding of aggravating circumstances which the Court finds were specifically proven beyond a reasonable doubt and to a moral certainty, the Court must reject the recommendation of the jury.
 IV CONCLUSION
The death penalty act requires this Court to make an independent analysis of the fact and apply the law to those facts in reaching its conclusion with regard to sentence.
The Court, in conducting the required independent analysis and evaluation of the facts and the aggravating circumstances and the mitigating circumstances, has given the advisory verdict solemn deliberation in determining the weight to be attached.
Under the facts and law of this case and after due consideration and analysis of all the circumstances and consideration of the aggravating circumstances and mitigating circumstances and in weighing them, and in weighing them against each other, the Court concludes and is of the opinion that the aggravating circumstances outweigh the mitigating circumstances.
It is THEREFORE, ORDERED, ADJUDGED AND DECREED that the defendant be sentenced to death by electrocution.
DONE AND ORDERED this 6th day of January, 1984.
 /s/ Billy C. Burney
BILLY C. BURNEY, Circuit Judge