The appellant was convicted of the capital crime of murder during the course of a robbery, in violation of §13A-5-40(a)(2), Code of Alabama (1975), and was sentenced to death. For the reasons outlined below, we affirm.
On June 24, 1982, the partially decomposed body of William Claude Parker was discovered near a roadway leading to the Shell Chemical Plant in North Mobile County. The body was discovered by a delivery man, and a positive identification was made by the victim's son, Marty Parker. According to the pathologist's testimony, the deceased had been repeatedly stabbed and had been beaten about the head and face with a piece of wood. The autopsy revealed a wound approximately ten inches long and three inches deep in the victim's neck. The autopsy also revealed 15 lacerations in the victim's head and face and six stab wounds in his chest. Although there was some testimony that his victim was intoxicated at the time of his death, the pathologist explained that the decomposition of the body could have produced some of the alcoholic reading. According to the pathologist, the victim's death occurred sometime during the late evening hours of June 22, or during the early morning hours of June 23, 1982.
The victim's green Ford one-ton pickup truck was discovered abandoned in Fairhope and was impounded by the police and searched. Beer cans, wine bottles, clothing, and welding equipment were discovered inside the truck. Although the truck was processed for fingerprints, no usable prints were obtained.
On the afternoon of June 23, 1982, a waitress at the Blue Marlin restaurant in Barnwell waited on a woman and three men. The waitress identified one of the men in the group as the appellant. According to the waitress's testimony, the appellant paid for the meal with an out-of-town check drawn on the account of "William Claude Parker and Martha M. Parker." The waitress explained that she watched as the appellant and his group left the restaurant in a green "welder's" truck. In court, the waitress inspected some photos and identified the decedent's truck as the truck used by the appellant. The waitress also testified that the appellant showed her his driver's license when he presented the check, but held the license so that she could not see the name on it. The victim's son testified that the signature on the check was a forgery.
The appellant's brother, Freddie Franklin Williams, testified that on the evening of June 22, 1982, he and the appellant's girlfriend, Lisa Ellison, were together. The appellant received a telephone call from his cousin, Everett Waters, who asked the appellant to meet him at the Village Drive Inn, a local "beer joint" or "night club." Freddie testified that he did not see his brother again until the next afternoon when the appellant and Waters arrived in a green "welder's" truck that they had allegedly "borrowed."
Freddie testified that he went with the appellant and Waters in the truck to get some beer and wine. The group then picked up Lisa Ellison before driving to Fairhope. According to Freddie, they stopped for lunch at the Blue Marlin restaurant *Page 739 
in Barnwell. While they were at the restaurant, Freddie testified that his brother told him that they had beaten a man named Parker with a "tire tool" and had taken his truck. The appellant then gave Freddie a ring with the initial "P" on it and told him to keep it for the appellant. This ring was identified by Marty Parker, the victim's son, as his father's ring. According to Freddie's testimony, when the truck broke down in Fairhope, they abandoned it and caught a ride home.
Lisa Ellison testified that at the time of the murder she was 17 years old and was living with the appellant at his parent's home in Prichard. Ellison stated that she had known the appellant for approximately eight months. Ellison testified that on the night of June 22, 1982, the appellant received a telephone call from his cousin, Everett "Bo" Waters, and left to meet him at the Village Drive Inn. According to Ellison, she saw the appellant the next day arrive with Waters, driving a green "welder's" truck. She testified that she accompanied the appellant, Waters, and Freddie Williams to Fairhope to go swimming. They ate lunch at the Blue Marlin restaurant in Barnwell on their way to Fairhope. When the truck broke down in Fairhope, she got a ride home by herself and did not see the appellant again until the next day. Ellison then testified that the following occurred.
 "[State's attorney]: Did you have a conversation [with the appellant]?
"[Lisa Ellison]: Yes, sir.
"Q What did Mr. Williams tell you?
 "A He just said that when they got up to the Village [Drive] Inn that [Everett Waters] pointed this guy out to him and said he had $1500.00 and then he said they was [sic] going to take this guy home because he was drunk, and he said they left and went toward wherever he lived and then they got out and had a scuffle or whatever you want to call it.
 "Q And then did he tell you anything else about what happened?
 "A Yeah, he said that he got a two-by-four out of the truck and hit him in the head with it and then he said he tied his neck and arms with something, something to do with a rope, and then he told Everett to hand him his knife and then he stabbed him and cut his throat. He told me he did.
"Q Roy Williams told you he stabbed him?
"A Mm-hm.
"Q And cut his throat?
"A Yes, sir.
"Q And he told this to you?
"A Yes, sir.
". . . .
 "Q Did this man right here [the appellant] ever tell you who did the stabbing and the cutting of the throat?
"A He said he did.
 "Q Did he ever tell you what [the victim's] name was?
"A Yes.
"Q What was his name?
"A Claude Parker."
The last person to see Claude Parker alive, other than his assailants, was a co-worker, who testified that on the evening of June 22, he and Parker were together until Parker left the co-worker's house around 9 o'clock. The co-worker testified that a short time after Parker left, he drove by the Village Drive Inn and saw Parker's truck in the parking lot.
The appellant was arrested in Russellville, Arkansas, and returned to Mobile to appear at a bond hearing on the morning of July 19, 1982. While the appellant was in the courtroom that morning, he told Detective Sergeant Ron Diegan, of the Mobile County Sheriff's Department, that he wanted to talk to him. Diegan testified that he met with the appellant and advised him of his constitutional rights. According to Diegan, when he asked the appellant if he understood his rights, the appellant stated "Yes, I seen many of them. I know it better than you do." Diegan testified that after the appellant executed a waiver of rights form, he gave a voluntary statement of how he killed Parker with "Bo's knife." The appellant admitted that the figure of $1500 was "mentioned" but denied that the motive was robbery. Later that day, the *Page 740 
appellant led Diegan and Detective Estes to a place in Fairhope and showed them where he had buried Parker's wallet and personal papers.
While Diegan and the appellant were in the room together, the appellant saw a newspaper clipping on the bulletin board which described the death of Claude Parker and estimated that Parker was killed the night of June 21, 1982. According to Detective Diegan, the appellant stated that the newspaper article gave the wrong date; "[t]hat if it in fact happened on the 21st, then he had seen a ghost on the night of the 22d."
 I
The first issue concerns the State's challenge for cause of those jurors who expressed a fixed opinion against capital punishment. The appellant argues that this exclusion denied him his right to a fair and impartial jury because, according to the appellant, "death qualified" juries are "more likely to convict in the guilt phase of the trial." This precise issue, however, has been recently decided adversely to the appellant. In Lockhart v. McCree, 476 U.S. 162, 106 S.Ct. 1758,90 L.Ed.2d 137 (1986), the United States Supreme Court concluded that the "death qualification" procedure used by the State's attorney in capital cases is permissible because it is "carefully designed to serve the State's concededly legitimate interest in obtaining a single jury that can properly and impartially apply the law to the facts of the case at both the guilt and sentencing phases of a capital trial." (Footnote omitted.) See also: Wright v. State, 494 So.2d 726
(Ala.Cr.App. 1985).
 II
The appellant argues that the trial court improperly allowed certain hearsay testimony to be presented during the trial of the case. The allegedly improper question was posed to Detective Diegan, as follows: "Did any of these people with whom you spoke put this Defendant in the truck belonging to the late victim?" Appellant's argument is without merit because the substance of the testimony had been previously elicited, without objection, from a State's witness during direct examination. Additionally, this testimony was repeated during cross-examination when defense counsel questioned the same State's witness. Thus, the trial court's overruling of the objection was not erroneous. Jelks v. State,411 So.2d 844, 849 (Ala.Cr.App. 1981); Bland v. State,390 So.2d 1098 (Ala.Cr.App.), cert. denied, 390 So.2d 1109
(Ala. 1980), cert. denied, Bland v. Alabama,451 U.S. 991, 101 S.Ct. 2332, 68 L.Ed.2d 851 (1981).
Even assuming, arguendo, that the overruling of the objection was improper, the error was harmless. Based on the testimony of Lisa Ellison and Freddie Williams, it was established that the appellant drove the deceased man's truck to Fairhope. Moreover, the appellant admitted that he killed Parker and also admitted that he stole Parker's truck. Thus, even if the testimony was improper hearsay, the error was harmless because there was no prejudice to the appellant as a result. State v.Hicks, 133 Ariz. 64, 69, 649 P.2d 267, 272
(Sup.Ct. 1982).[1]
 III
The appellant also argues that the trial court improperly instructed the jury, during the sentencing phase of the trial, that they could consider the fact that the capital offense was committed by a person under sentence of imprisonment as an aggravating circumstance, as provided in § 13A-5-49(1),Code of Alabama (1975). It was later established at the sentencing hearing, however, that the appellant was not on probation, nor was he on parole, at the time that the crime was committed. The appellant argues that mere consideration *Page 741 
by the jury of an improper aggravating circumstance requires that the sentence of death be set aside.
The trial court, however, is the ultimate sentencing authority under § 13A-5-47(e), Code of Alabama
(1975). In the present case, the trial court specifically found that the appellant was not under a sentence of imprisonment at the time of the offense. For this reason, the appellant's death sentence was based only upon consideration of proper aggravating circumstances. Because the trial judge reweighed the aggravating and mitigating circumstances, and expressly did not consider the incorrect aggravating circumstance, the error in the instruction was harmless.
 IV
The appellant argues that the Alabama Capital Punishment Statute violates the provisions of Article I, Section 11, of the Alabama Constitution which provides "[t]hat the right of trial by jury shall remain inviolate." This precise issue was thoroughly discussed and decided adversely to the appellant in the recent case of Crowe v. State, 485 So.2d 351
(Ala.Cr.App. 1984), rev'd on other grounds,485 So.2d 373 (Ala. 1985), on remand, 485 So.2d 378
(Ala.Cr.App. 1986), cert. denied, Alabama v. Crowe,477 U.S. 909, 106 S.Ct. 3284, 91 L.Ed.2d 573 (1986). InCrowe, this court expressly concluded that "the advisory nature of the jury's sentence verdict under §13A-5-46, Code of Alabama 1975, is not violative of Article I, Section 11." Id., 485 So.2d at 364.
 V
The appellant also argues that the Alabama Capital Punishment Statute violates the Fifth, Eighth and Fourteenth Amendments of the United States Constitution in that it constitutes cruel and unusual punishment. The appellant contends that neither the jury nor the trial court has the proper standards to determine and weigh the aggravating and mitigating circumstances and thus the imposition of the death penalty is arbitrary. Numerous decisions by this court, as well as the United States Supreme Court, have expressly rejected this argument. Crowe v.State, supra, 485 So.2d 351 at 364-365; Proffitt v.Florida, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913
(1976); Furman v. Georgia, 408 U.S. 238,92 S.Ct. 2726, 33 L.Ed.2d 346 (1972); Zant v. Stephens,462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983).
 VI
The appellant argues that the trial court failed to inform the jury during the sentencing phase of the trial that their verdict would be "merely advisory." Contrary to the appellant's position, however, the record clearly shows that the trial court repeatedly informed the jury that their duty would be to "recommend" the appropriate punishment to the trial court. The trial court's jury instructions at the sentencing phase, were, in all respects, proper.
 VII
The appellant argues that he was improperly sentenced to death because the sole aggravating circumstance was that the capital offense was committed while the defendant was engaged in the commission of a robbery. The appellant argues that "the crime charged in the indictment cannot be used as both the criminal charge and a circumstance aggravating that charge."
In the instant case, the appellant was properly convicted of the capital offense of murder, during the course of a robbery, in violation of § 13A-5-40(a)(2), Code of Alabama
(1975). Because the offense was committed in June of 1982, the provisions of § 13A-5-50, Code of Alabama (1975), as follows, would apply:
 "The fact that a particular capital offense as defined in Section 13A-5-40(a) necessarily includes one or more aggravating circumstances as specified in Section 13A-5-49 shall not be construed to preclude the finding and consideration of that relevant circumstance or circumstances in determining sentence. By way of illustration and not limitation, the aggravating circumstance specified in *Page 742 
Section 13A-5-49(4) shall be found and considered in determining sentence in every case in which a defendant is convicted of the capital offenses defined in subdivisions (1) through (4) of subsection (a) of Section 13A-5-40."
Thus, appellant's argument is without merit. Bradley v.State, 494 So.2d 750 (Ala.Cr.App. 1985); Ford v.State, 515 So.2d 34 (Ala.Cr.App. 1986); Dobard v.State, 435 So.2d 1338 (Ala.Cr.App. 1982), aff'd,435 So.2d 1351 (Ala. 1983), cert. denied,464 U.S. 1063, 104 S.Ct. 745, 79 L.Ed.2d 203 (1984).
 VIII
The appellant argues that he was entitled to have his motion for new trial granted based upon ineffective assistance of counsel. After the trial of the case, a hearing on the appellant's motion for new trial was held. At the hearing, the appellant, as well as certain members of his family, testified concerning conversations which the appellant had with his court-appointed attorney who had represented him at trial.[2]
It is the appellant's position that trial counsel assured him that the case was "cut and dried," and that he would receive a sentence of life imprisonment without parole, as opposed to the death penalty, if he pleaded guilty. Defense counsel had not subpeonaed any witnesses on the day of trial and, according to the appellant, was not prepared to try the case. After hearing the evidence presented at the hearing on motion for new trial, the motion was denied.
The trial court did not abuse its discretion when it denied the motion for a new trial. The allegations and claims presented at the motion for new trial had previously been presented to the trial court on the day of trial. At that time, defense counsel moved for a continuance and argued that he was under the impression that he had an "understanding" with Chris Galanos, the district attorney, in connection with a plea bargain agreement. District Attorney Galanos stated, at the pre-trial hearing on the request for a continuance, that no such agreement existed and, in fact, noted that he would not have been able to enter into such an agreement. According to District Attorney Galanos, "at no time since God created heaven and earth" had there been an agreement concerning a "final disposition" of the case. The trial judge at the pre-trial hearing also specifically stated that he had discussed the possible options if the appellant decided to enter a plea of guilty. The trial judge also stated that he had explained to defense counsel "some time ago" that even if the State recommended life imprisonment without parole, as a part of the plea bargain agreement, the jury could, "in all of its wisdom," enter a verdict recommending death, regardless of the State's recommendation.
As one of the grounds for the pre-trial request for a continuance, the defendant argued that he had not subpeonaed any witnesses for the trial of the case. When the trial court specifically asked the defendant "Do you know of anyone that you would like for me to issue a subpeona in your behalf?" however, the defendant responded: "Not right off hand, I don't, your honor." At the hearing on the motion for a new trial, the defendant offered no evidence, by way of testimony or witness list, which would support his claim that witnesses could have been subpeonaed which would have assisted his defense. As the trial court noted at the hearing on the motion for a new trial, all of the relevant testimony had been considered prior to trial, in connection with the request for a continuance.[3] *Page 743 
In the present case, the appellant has not met the standard of proof established by the recent United States Supreme Court decision of Strickland v. Washington, 466 U.S. 668,104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Even if it was error for trial counsel not to subpoena witnesses in support of the defense, there is no indication that the error had any effect on the appellant's conviction. There was no evidence that "but for" counsel's unprofessional errors, the result of the appellant's trial would have been different. A review of the record indicates that defense counsel thoroughly cross-examined the witnesses called by the State and presented objections throughout the trial. Although counsel waived opening argument, such a decision is clearly within the realm of trial tactics. Defense counsel gave a competent and comprehensive closing argument and, considering all of the evidence against the appellant, which overwhelmingly established his guilt, it appears that defense counsel adequately protected the appellant's rights. In addition to the appellant's own incriminating statements, the State presented testimony from the appellant's brother, as well as his girlfriend, which established his guilt. As the United States Supreme Court noted in Strickland, "The object of an ineffectiveness claim is not to grade counsel's performance," 466 U.S. at 675,104 S.Ct. at 2058. Because the appellant did not show that he suffered any prejudice as a result of the claimed ineffective assistance of counsel, there is no reason for this court to dispute the trial court's finding that a new trial was not warranted.
 IX
This court has made an independent review of the propriety of the death sentence imposed in this case. We have also reviewed the sentencing procedure to determine whether any error occurred at that point, as required by § 13A-5-53(a),Code of Alabama (1975). As previously discussed in connection with Issue III, the jury, at the sentencing phase of the trial, was improperly instructed that they could consider as an aggravating circumstance the fact that the appellant was under a sentence of imprisonment at the time the crime was committed. Although this instruction was erroneous, the error was harmless because the trial court did not consider this aggravating circumstance when the sentence was pronounced.
Additionally, as required by § 13A-5-53(a), we have reviewed the trial court's findings concerning the aggravating and mitigating circumstances and have determined that they are supported by the evidence.
This court is under an obligation to review the propriety of the decision that death was the proper sentence under the provisions of § 13A-5-53(b), Code of Alabama
(1975). We have reviewed the evidence presented in this case and conclude that there was no evidence that the sentence of death was "imposed under the influence of passion, prejudice, or any arbitrary factor." See § 13A-5-53(b)(1).
This court must also independently weigh the aggravating and mitigating circumstances in order to determine whether death was the proper sentence, under the provisions of §13A-5-53(b)(2). In this case, the aggravating circumstance that the victim was intentionally killed by the appellant while the appellant was committing a robbery clearly outweighs the mitigating *Page 744 
circumstances (there having been none found).
Considering both the nature of the crime and this appellant, this court has also independently determined that the sentence of death is not excessive or disproportionate to the penalty imposed in similar cases. As this court has previously noted, "approximately two-thirds of the death sentences imposed in this State are for capital offenses involving robbery."Wright v. State, 494 So.2d 726 (Ala.Cr.App. 1985). We have made our review in strict compliance with the provisions of § 13A-5-53(b)(3), Code of Alabama (1975), and conclude that the sentence of death is, in all respects, proper.
After a thorough review of the sentencing proceedings, this court has independently determined that there was no error made which adversely affected the appellant's rights; that the trial court's findings concerning the aggravating and mitigating circumstances are supported by the evidence; and that the sentence of death is proper in this case.
AFFIRMED.
All the Judges concur.
[1] In State v. Hicks, the appellant's conviction for first degree murder was upheld by the Arizona court. In reaching this conclusion, the court found that where two witnesses for the prosecution had previously testified concerning the victim's reputation for peacefulness, without objection by defense counsel, no prejudice resulted from testimony presented by subsequent witnesses, despite objection by defense counsel.
[2] Essentially, at the motion for a new trial, the appellant and members of his family argued that they had paid money to defense counsel in exchange for his "guarantee" that the appellant would receive a term of imprisonment of life without parole. Defense counsel testified at the motion for a new trial and expressly denied that he had ever entered into such an agreement.
[3] The trial court's denial of the request for a continuance on the day of trial was proper. The appellant was arraigned on October 8, 1982, and entered a plea of "not guilty." Although trial was set for November 1, 1982, the court prior to that date entertained a motion, filed by the State, asking that the trial be reset for December 6, 1982. After defense counsel stated that he had no objection to the continuance, the request was granted. On November 24, 1982, the appellant again appeared in open court, along with his court-appointed counsel, and agreed that the trial date could be rescheduled, when it was determined that one of the State's witnesses would not be available for trial on December 6.
The case was again passed at the request of defense counsel when the appellant indicated that he wished to enter a plea of guilty. On January 19, 1983, however, the appellant, along with court-appointed counsel, appeared in open court and withdrew the request. The trial court noted that the defendant had "changed his mind" and the case was again passed, at the request of the defendant. Because the previous request for a continuance had been granted, the request on February 22, 1983, for an additional continuance was without merit and was properly denied by the trial court.