718 So.2d 1148 (1995)
Jimmy DAVIS
v.
STATE.
CR-93-1364.
Court of Criminal Appeals of Alabama.
October 20, 1995.
Opinion on Return to Remand July 3, 1996.
Opinion on Second Return to Remand March 21, 1997.
Rehearing Denied May 23, 1997.
*1151 H. Wayne Love, Anniston; and Valerie Palmedo, Anniston, for appellant.
Jeff Sessions and Bill Pryor, attys. gen.; Clayton Crenshaw, asst. atty. gen.; and Tracy Daniel, deputy atty. gen., for appellee.
PATTERSON, Judge.
The appellant, Jimmy Davis, was indicted on May 17, 1993, in Calhoun County, for the capital offense of murder committed during a robbery in the first degree, in violation of § 13A-5-40(a)(2), Code of Alabama 1975. A jury found him guilty as charged on December 10, 1993. A sentencing hearing was held before the jury, in accordance with §§ 13A-5-43 through -46, and the jury returned as advisory verdict recommending that the appellant be sentenced to death. The vote of the jury in arriving at the advisory verdict was 11 in favor of death and 1 in favor of life imprisonment without the possibility of parole. Thereafter, the trial court held another sentencing hearing and, on March 4, 1994, sentenced the appellant to death. The appellant raises five issues on appeal.
We note at the outset that the trial court has failed to comply with the requirements of § 13A-5-47(d), which provides as follows:
"Based upon the evidence presented at trial, the evidence presented during the sentence hearing, and the pre-sentence investigation report and any evidence submitted in connection with it, the trial court shall enter specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in Section 13A-5-49, each mitigating circumstance enumerated in Section 13A-5-51, and any additional mitigating circumstances offered pursuant to Section 13A-5-52. The trial court shall also enter written findings of facts summarizing the crime and the defendant's participation in it."
The record does not contain a sentencing order. The appellant calls this to our attention in his brief, and the attorney general moves that we remand the case to the trial court with instructions that it enter an appropriate sentencing order. We agree that the case must be remanded. The record reflects that the trial court addressed the requirements of § 13A-5-47(d) to some extent at the sentencing hearing; however, the record does not indicate whether the trial court considered the presentence report and there are no findings of fact summarizing the crime and the appellant's participation in it. While the trial court could satisfy the requirements by reading its sentencing order into the record at sentencing, the accepted and preferred *1152 practice in this state is to prepare a formal sentencing order encompassing all of the requirements of § 13A-5-47(d).
Without full knowledge of what the trial court did and what it considered in arriving at its sentence, we are unable to properly review its sentencing decision. Because of the lack of a sentencing order, we remand this cause to the trial court with directions that it prepare and enter such an order and, in doing so, that it fully comply with § 13A-5-47(d). The trial court is instructed to take all action necessary to permit the clerk of the circuit court to file with this court a return within 28 days from the release of this opinion.
We pretermit discussion of the remaining issues raised by the appellant until we have received the sentencing order.
REMANDED WITH DIRECTIONS.
All Judges concur.

On Return to Remand [July 3, 1996]
PATTERSON, Judge.
Jimmy Davis appeals from his conviction for capital murder and his subsequent sentence to death. In Davis v. State, 718 So.2d 1148 (Ala.Cr.App.1995), we remanded this case to the trial court for the preparation of a formal sentencing order. At that time, we pretermitted discussion of the issues raised on appeal. The trial court has since filed a sentencing order with this court, and we have returned to the issues raised on appeal. Because of intervening caselaw, however, we must remand this case to the trial court to enter additional findings of fact regarding its denial of Davis's Batson motion and, if necessary, to conduct a new hearing on the issue.
The record shows the following with regard to Davis's Batson motion. After the jury was struck and out of the presence of the jury, Davis moved to quash the petit jury, arguing that the prosecutor violated Batson by allegedly exercising peremptory challenges in a racially discriminatory fashion. In his attempt to establish a prima facie case, Davis noted that the prosecutor used 9 of 14 peremptory challenges to remove blacks from the jury. (Davis conceded that he also struck one black veniremember.) Davis made no further arguments or allegations in support of his motion. A colloquy followed, during which the trial court, the prosecutor, and the defense reviewed the statistical composition of the jury. It was noted that four blacks and eight whites had been selected to sit on the petit jury, and that both alternate jurors were white. It was further noted that, although blacks comprised 331/3% of the petit jury (excluding alternates), they comprised 12.59% of the jury venire and less than 20% of the population of the county at large. At the conclusion of the colloquy, the trial court noted the grounds of the motion, reviewed the statistical evidence presented, and held that Davis had failed to present a prima facie case under Batson.
These facts show that, in considering Davis's motion, the trial court placed great weight on the fact that the petit jury contained a higher percentage of blacks than both the jury venire and the county at large. Its doing so is understandable, because at the time of the trial in this case, there was considerable confusion in Alabama regarding the law as it pertained to the use of statistical evidence to rebut evidence of a prima facie case of racial discrimination under Batson. See Ex parte Thomas, 659 So.2d 3 (Ala.1994), and cases cited therein. Thomas was decided shortly after Davis was convicted. In Thomas, the Alabama Supreme Court held that the fact that a greater percentage of blacks sat on the petit jury than was on the jury venire does not, as a matter of law, defeat a Batson challenge that is supported only by allegations regarding the prosecutor's pattern of strikes. Thomas further held that "such a statistical showing [by the prosecutor] weakens a prima facie case." Id., at 8 (emphasis added) (citing Ex parte Bird, 594 So.2d 676 (Ala.1991)). As noted above, the trial court appears to have relied heavily on the statistical showing; however, certain statements by the trial court at the hearing suggest that it may have also considered other unspecified factors in its ruling.
Because the trial court placed great weight on the statistical evidence presented at *1153 Davis's Batson hearing, even though it appears that this may not have been the sole basis of his ruling, we find that a remand is necessary. See Grimsley v. State, 678 So.2d 1194 (Ala.Cr.App.1995); Hodges v. State, 673 So.2d 783 (Ala.Cr.App.1995); Wood v. State, 705 So.2d 514 (Ala.Cr.App.1995); Cobb v. State, 678 So.2d 247 (Ala.Cr.App.1995). On remand, we instruct the trial court to enter specific findings regarding whether, in denying Davis's Batson motion, it considered any factors other that the statistical evidence discussed in the colloquy. For example, we direct the trial court to the following factors enumerated in Ex parte Branch, 526 So.2d 609 (Ala.1987):
"1. Evidence that the `jurors in question share[d] only the one characteristic their membership in the group and that in all other respects they [were] as heterogeneous as the community as a whole.' People v. Wheeler, 22 Cal.3d 258, 280, 583 P.2d 748, 764, 148 Cal.Rptr. 890, 905 (1978)....
"2. A pattern of strikes against black jurors on the particular venire....
"3. The past conduct of the state's attorney in using peremptory challenges to strike all blacks from the jury venire....
"4. The type and manner of the state's attorney's questions and statements during voir dire, including nothing more than a desultory voir dire....
"5. The type and manner of the state's attorney's questions directed to the challenged juror[s], including a lack of questions, or a lack of meaningful questions ....
"6. Disparate treatment of members of the jury venire with the same characteristics, or who answer a question in the same or similar manner....
"7. Disparate examination of members of the venire....
"8. Circumstantial evidence of intent may be proven by disparate impact where all or most of the challenges were used to strike blacks from the jury....
"9. The state used peremptory challenges to dismiss all or most black jurors...."
Id., at 622-23 (citations omitted). Because of the nature of this particular case, and to aid our review of the trial court's ruling, we request that the trial court make specific findings as to each factor it considered in denying Davis's motion, and its conclusions regarding each factor considered.
In the event that the trial court finds that its ruling was based entirely on the "sophisticated numbers game" subsequently disapproved in Thomas, then the trial court must conduct a new Batson hearing. At that hearing, if such a hearing is necessary, the trial court shall
"consider `all relevant circumstances' that could show discrimination or the lack of discriminatory intent. Branch. The fact that the jury is composed of a high percentage of the group that is alleged to have been excluded is only one factor that the court should consider when determining whether a prima facie case of discrimination has been established. Thomas. If the court finds that the appellant established a prima facie case of discrimination, then the court should require the state to give reasons for striking the blacks from the venire and proceed as directed by Branch. If the court decides that the appellant has failed to establish a prima facie case, it shall set forth, in its written finding of facts and conclusions of law, the specific reasons for that determination. On remand, the trial court is entitled to grant the appellant any relief to which he may be entitled."
Grimsley, 678 So.2d at 1197.
Accordingly, this case is remanded to the trial court to enter into the record the specific findings upon which it based its denial of Davis's Batson motion. If the trial court determines that its findings do not support its earlier ruling, then the trial court must conduct a new Batson hearing. The trial court may choose to conduct a new Batson hearing on its own motion, even if it believes its findings support its previous ruling.

REMANDED WITH DIRECTIONS.
All Judges concur.

On Second Return to Remand [March 21, 1997]
PATTERSON, Retired Appellate Judge.
The appellant, Jimmy Davis, was indicted May 7, 1993, by the Calhoun County grand *1154 jury for the capital offense of murder committed during a robbery in the first degree or an attempt thereof. See § 13A-5-40(a)(2), Code of Alabama 1975. The indictment reads, in pertinent part, as follows:
"The Grand Jury ... charge that ... Jimmy Davis ... did, on or about ... March 17, 1993, intentionally cause the death of... Johnny Hazle, by shooting him with a pistol ... during the time that Jimmy Davis was in the course of committing a theft of a quantity of lawful United States currency, a better description of the value and denominations of which is unknown to the Grand Jury, the property of Johnny Hazle, by the use of force against the person of Johnny Hazle, with intent to overcome his physical resistance or physical power of resistance, while the said Jimmy Davis was armed with a deadly weapon, to-wit: a pistol, in violation of § 13A-5-40(a)(2) of the Code of Alabama...."
At arraignment, the appellant pleaded not guilty. On December 10, 1993, a jury found him guilty of the capital offense charged in the indictment. A sentencing hearing was held before the jury, in accordance with §§ 13A-5-45 and -46, and the jury recommended, by a vote of 11 to 1, that the sentence should be death.[1] Thereafter, the trial court held another sentencing hearing in accordance with § 13A-5-47, and, after weighing the aggravating and mitigating circumstances and considering the jury's recommendation and considering the presentence report, it sentenced the appellant to death.[2] The appellant appeals his conviction and sentence, raising five issues. We will address those issues in the order they appear in the appellant's brief. We have searched the record for plain error as required by Ala.R.App.P. 45A.[3]
This case has previously been remanded to the trial court twice for further proceedings. On October 20, 1995, we remanded the case because the record did not contain a sentencing order. Davis v. State, 718 So.2d 1148 (Ala.Cr.App.1995). On that remand, we instructed the trial court to prepare and file a sentencing order in accordance with § 13A-5-47(d). The trial court complied and filed a return that contained a sentencing order. On July 3, 1996, we remanded the case again with instructions for the trial court to enter specific findings of facts upon which it based its denial of the appellant's motion to quash the petit jury, which motion was based on the alleged ground that the state had exercised its peremptory strikes in a racially discriminatory manner in violation of the rule announced in Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Davis v. State, 718 So.2d 1152 (Ala.Cr.App.1996). We deemed this remand necessary because of the intervening decision of the Alabama Supreme Court in Ex parte Thomas, 659 So.2d 3 (Ala.1994), in which the Court held that the fact that a greater percentage of blacks served on the petit jury than were on the jury venire did not, as a matter of law, defeat a Batson challenge that was supported only by allegations regarding the prosecutor's pattern of strikes. The trial court has complied with our instructions and has filed a second return. The return now contains the specific findings of the trial court upon which it based its denial of the appellant's Batson motion. The adequacy of the sentencing order and the questions regarding the trial *1155 court's ruling on the Batson motion are raised in the appellant's brief, and will be addressed below.
The state's evidence showed that on March 17, 1993, the appellant, Alphonso Phillips, and Terrance Phillips made plans to rob the Direct Oil Station, a gasoline service station in Anniston. According to the plan, the appellant, who possessed a .25 caliber semiautomatic pistol, would point the pistol at the station operator, Alphonso would grab the money, and Terrance would act as a lookout. The state's evidence supports the conclusion that the appellant was the principal actor in the conspiracy. He conceived the idea to rob the station and he recruited the others to help him. As the trio approached the station, Terrance changed his mind, abandoned the conspiracy, and walked away. Alphonso and the appellant approached the station; the appellant confronted the operator, Johnny Hazle, in the doorway of the station, pointed the pistol at him, and said, "Give it up, fuck-nigger." The appellant almost immediately fired two shots from the pistol, which struck Hazle in the chest and abdomen. Terrance testified that he was about a block from the station, walking toward his home, when he heard two or three shots fired. After the shooting, the appellant and Alphonso ran from the scene. Hazle died from these wounds shortly thereafter. Three empty .25 caliber shell casings were recovered at the scene, and two bullets of the same caliber were recovered from Hazle's body. The pistol was subsequently recovered. The ballistics evidence showed that the two bullets recovered from Hazle's body and the three empty shell casings found at the scene had been fired from the appellant's pistol. Alphonso and Terrance entered into agreements with the state pursuant to which in return for their testimony against the appellant they would be permitted to plead guilty to conspiracy to commit robbery in the first degree.[4]
Alphonso, testifying for the state, stated that as he and the appellant reached the door of the station, the appellant pointed the pistol at Hazle and said, "Give it up, fuck-nigger"; that Hazle looked inside the store and smiled; and that the appellant shot Hazle when he smiled. Several witnesses for the state testified that the appellant told them shortly after the shooting that he had shot the Direct Oil Station operator. In his testimony, Terrance described his conversation with the appellant as follows:
"He [the appellant] said he had told him [the operator], `Give it up, fuck-nigger.' And then he said the man had smiled or something at him, laughed or something. And then he said he had shot and the man had kicked the door. And then he shot again. I don't know I can't remember how many times he said he shot. And then he said they ran."
Alphonso testified as follows: "[The appellant] said, `Man, I shot that fuck-nigger, I shot him.' And then he said, `The second time felt even better than the first time.'" Willie James Smith, an acquaintance of the appellant, testified, "[The appellant] ... told me he had shot someone ... [a]nd told me he had robbed Direct and shot someone." Smith also testified that the appellant told him that Alphonso and Terrance were with him and that the appellant "said that the man wouldn't give up the money, so he shot him three times." Shannon Hardy Wilson, another acquaintance of the appellant, testified as follows about his conversation with the appellant:
"Before they got in there, he said they pulled up their bandannas and they went in there. And when he got to the door [the appellant] said, `Give it up.' And that Mr. Hazle laughed at him and that Alphonso ran. And then he said he told him to give it up again. And he said Mr. Hazle laughed at him and then he shot him."
Wilson further testified that the appellant said he "wasn't going to let no cracker laugh at him."
The appellant did not testify and called only one witness in the guilt phase, Tim Whatley, an investigator with the Anniston *1156 police department, who testified as to his observations at the scene of the crime shortly after the shooting and the description of the fleeing suspects he obtained from witnesses at or near the scene. The appellant's defense strategy consisted mainly of trying to discredit or to cast doubt upon the testimony of the state's witnesses through cross-examination and arguments to the jury and to the trial court. By these means, he attempted to exploit differences as to some details in their testimony, attempted to persuade the jury that under the facts it was more likely that Alphonso did the shooting, argued to the jury and to the trial court that the facts surrounding the commission of the crime better fit the elements of the lesser included offense of felony-murder rather than with the offense of capital murder, and attempted to cast doubt upon the veracity of Alphonso, Terrance, and Smith (who was involved with the authorities in an unrelated case) by emphasizing the deals they had made with the state for lenient treatment in return for their testimony.
At the sentencing phase of the trial before the jury, the prosecutor introduced evidence of the appellant's 1992 conviction for third degree robbery. Thereafter, the appellant called three witnesses: his mother, Lillie Bell Davis; his first cousin, Andre Lamont Sigler; and a counselor, Annie M. Storey. His mother testified generally about the appellant's background and family life. She stated that she and her husband, who was the appellant's father, separated when the appellant was one year old, and that the appellant never had the benefit of a father in the home when he was growing up. She stated that the appellant went to Detroit to live with his father when he was 15 years of age, but that his father died shortly thereafter and that his death was devastating to the appellant. She further testified that she began to have trouble with the appellant when he was about 9 years old; that he would misbehave at school and at home; that he dropped out of school when he was 16; that he would not work, would stay out at night, and was frequently in trouble; that after he turned 17, she could not handle him; and that he left home when he was 19. She asked the jury to spare her son's life. Sigler also testified about the appellant's background and home life. He stated that the appellant missed not having a father in the home; that because of his circumstances he "missed a lot" when he was growing up; that when he was growing up he had no one to rely on, to talk to, or to help him; that when his father died he was noticeably affected and his appearance and attitude changed; and that he had not had the advantages that Sigler had had. Sigler also asked the jury to recommend a sentence of life imprisonment without parole. Storey, a counselor employed by the Calhoun-Cleburne Mental Health Center and the Oxford city school system, testified that she administered intelligence and diagnostic educational tests to the appellant before his trial; that he had a full-scale IQ of 77, which placed him at the 6th percentile, i.e., 94% of the people in his age group scored higher; that an IQ of 77 is considered within the borderline range of intelligence; that he is functioning "between where we would consider an individual who is mentally retarded and one who is low average"; and that he functions at the 5th grade level academically. The appellant called only one witness at the second sentencing hearing before the trial court, his mother, who testified again about her son's general background and family life, and asked the court for mercy.
The appellant did not testify at the guilt or sentencing phases of the trial. At the time of the allocution, he made the following brief, unsworn statement to the trial court, denying his guilt:
"Judge, I'm innocent of this charge. And I feel like I've been discriminated. Not only in this courtroom, but in the public eye. Now, I will be happy if the state bring the defendant, the real defendant to this courtroom.
"And I'm very sorry for Mr. Hazle and I would like to apologize to the family members and everything, but it wasn't me. And I would like to thank my mom and my family for standing by me and being strong.
"That's it."
The appellant raises five issues on appeal. He does not question the sufficiency of the evidence to support his conviction. Even *1157 though he does not raise this issue on appeal, we have reviewed the evidence presented and find it was sufficient for the jury to find the appellant guilty beyond a reasonable doubt of the capital offense charged in the indictment. In fact, the evidence of his guilt is strong and convincing.

I.
The appellant contends that he was denied his constitutional rights, under both the state and federal constitutions, by the trial court's allowing the state to deathqualify the veniremembers and then granting the state's challenge for cause of those veniremembers who expressed opposition to the death penalty. He argues that this procedure violated his fundamental right to have an impartial jury determine his guilt. This issue was preserved for review by the trial court's denial of the appellant's pretrial motion "to prohibit death-qualification of prospective jurors." We find no merit in this contention. A jury composed exclusively of jurors who have been death-qualified in accordance with the test established in Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985),[5] is considered to be impartial even though it may be more conviction prone than a non-death-qualified jury. Williams v. State, 710 So.2d 1276 (Ala.Cr. App.1996). See Lockhart v. McCree, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986). Neither the federal nor the state constitution prohibits the state from a death-qualifying jurors in capital cases. Id.; Williams; Haney v. State, 603 So.2d 368, 391-92 (Ala.Cr.App.1991), aff'd, 603 So.2d 412 (Ala.1992), cert. denied, 507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed.2d 687 (1993).
The appellant also contends that the trial court erred in overruling his pretrial motion requesting separate juries for the guilt and sentencing phases of his trial. He argues, "When there are two separate issues, the feelings of the jurors on one issue should not eliminate the defendant's rights on the other issue." The appellant cites no authorities to support his contention, and we find no merit in it. Section 13A-5-46(b) provides, "If the defendant was tried and convicted by a jury, the sentence hearing shall be conducted before that same jury unless it is impossible or impractical to do so." Appellant urges this court to find that "where the use of the same jury in both portions of a trial deprives the appellant of one of his most fundamental rights, it is at least `impracticable.'" It was certainly not impossible or impractical for the jury in this case to hear and try both the guilt and jury portions of the sentencing phases of the trial. The Alabama capital punishment statute, which includes § 13A-5-46(b) and which proscribes the rules of procedure to be followed in death penalty cases, has been upheld against constitutional challenges many times. See, e.g., Beck v. State, 396 So.2d 645 (Ala.1980); Williams v. State, 556 So.2d 737 (Ala.Cr.App.1986), aff'd. in part, rev'd in part, 556 So.2d 744 (Ala.1987), cert. denied, 500 U.S. 938, 111 S.Ct. 2067, 114 L.Ed.2d 471 (1991); Owen v. State, 418 So.2d 214 (Ala.Cr.App.1982). Moreover, in approving a state's death-qualification procedure, the United States Supreme Court held that the death-qualification procedure is permissible because it is designed to serve the State's concededly legitimate interest in obtaining a single jury that can properly and impartially apply the law to the facts of the case at both the guilt phase and the sentencing phase of a *1158 capital trial. Lockhart v. McCree, 476 U.S. at 180, 106 S.Ct. at 1768-1769.

II.
The appellant contends that the state exercised its peremptory jury strikes in an allegedly racially discriminatory manner, in violation of Batson v. Kentucky. He raised the Batson issue by a timely motion to quash the venire after the jury was selected and before the jury was sworn; the trial court denied the motion. Relying on Ex parte Thomas, 659 So.2d 3 (Ala.1994), he argues that the trial court, in determining that he had failed to establish a prima facie case of discrimination, relied solely on a comparison of the percentage of blacks on the trial jury with the percentage of blacks on the venire from which the trial jury was selected and the percentage of blacks in the general population of the county from which the veniremembers were drawn. It was in response to this argument that we remanded this case for a second time, as explained above. The trial court submitted on return to our second remand specific findings regarding the factors it considered in denying the appellant's Batson motion. We note at the outset that the trial court, while considering the statistical evidence, considered other factors as well in reaching its decision. The appellant has filed no additional argument pointing to any error in the trial court's ruling or written findings.
Under Batson, the appellant was required to make a prima facie showing that the state had exercised a peremptory challenge or challenges on the basis of race. To prove a prima facie case of purposeful racial discrimination under Batson and its progeny, a defendant must show (1) that members of a cognizable racial group were excluded from the defendant's jury; (2) that the defendant is entitled to rely on the fact that peremptory challenges constitute a jury selection practice that permits those to discriminate who are of a mind to discriminate, and (3) that these facts and other relevant circumstances raise an inference that the prosecutor used such a practice to exclude venirepersons from the jury on account of race. Bush v. State, 695 So.2d 70 (Ala.Cr.App.1995); aff'd, 695 So.2d 138 (Ala.1997).
We will not reverse a trial court's Batson ruling unless it is clearly erroneous. Ex parte Lynn, 543 So.2d 709 (Ala.1988); Ex parte Branch, 526 So.2d 609 (Ala.1987); Mitchell v. State, 579 So.2d 45 (Ala.Cr.App. 1991), cert. denied, 596 So.2d 954 (Ala.1992). Great deference should be accorded a trial court's Batson ruling. Hernandez v. New York, 500 U.S. 352, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991). See Folsom v. State, 668 So.2d 114 (Ala.Cr.App.1995).
The record shows that of the 14 blacks on the panel of 116 from which the jury was struck, the state struck 9, the appellant 1, and 4 served on the trial jury. Two alternates were selected, and they were white. In selecting the jury, each side had 52 strikes. The appellant contended that the prosecution's striking of 9 blacks out of 14 available on the venire constitutes a prima facie Batson violation, and shows systematic discrimination by the state in the selection of the jury.
In denying the appellant's motion to quash the venire, the trial court found that the appellant had failed to make a prima facie showing of discrimination on the part of the state in the striking and selection of the jury. In its order on return to remand, the trial court made the following findings upon which it based its denial of the appellant's Batson motion:
"[T]he Court hereby finds and orders as follows:
"1. The jury panel, a full venire, was composed of 127 individuals. Sixteen of the panel were racial minorities. After challenges were ruled upon (the Court granted challenges to 11 panel members 9 majority and 2 minority), the panel consisted of 116 members with 14 of that number being a racial minority. The trial jury which rendered the verdict in this case was composed of 12 jurors, with 4 jurors being African-American. The striking procedure in this case brought forth a minority representation on the jury of 33 1/3% from a panel of approximately 12% minority representation. One of the *1159 12 black jurors was selected by the jury to serve as foreman. These statistical observations, among others, were set out in the record. The Court noted that minority representation on the trial jury exceeded both the panel from which it was struck and the community (Calhoun County) from which the venire was drawn. These observations by the trial court were not the sole basis for the Court's ruling in denying the Batson motion filed on behalf of the defendant and are not now the sole basis for the Court's ruling.
"2. This Court personally presided over both jury voir dire and the striking process. This Court observed the full proceedings, both the jurors and the attorneys, the manner in which the jurors were questioned and the manner in which the jurors responded. This Court, over the past 20 years, has presided over innumerable cases in which the Office of the District Attorney for the Seventh Judicial Circuit, and District Attorney Joseph D. Hubbard, in particular, has selected juries and prosecuted criminal cases. This Court has never witnessed the prosecution of any case or defendant due to discriminatory considerations of any kind. This Court has never observed any discriminatory action or conduct in the selection of a jury by the Office of the District Attorney in this circuit.
"3. This trial court, as directed by the Alabama Court of Criminal Appeals, has considered the factors enumerated in Ex parte Branch, 526 So.2d 609 (Ala.1987), and finds as follows:
"A. The Court finds there is no evidence the minority jurors struck by the State of Alabama shared only one characteristic their membership in the minority group.
"B. The Court finds upon full review of the striking process that there was not a pattern of striking minority jurors utilized by the State of Alabama. The office of the District Attorney of the Seventh Circuit has never to this observer's eye systematically struck minority jurors on a particular venire and did not do so in this case.
"C. This Court finds no evidence of past conduct by the State's attorneys in this Circuit using peremptory challenges to strike all blacks or other minorities from the jury venire.
"D. This Court finds that voir dire conducted by the State's attorneys was not desultory. The State of Alabama's voir dire of the jury panel was extensive and was [as] meaningful as the voir dire conducted by the defense. The Court, in voir dire examination, seated 12 jurors at a time and this process allowed counsel for the State and for the defendant to `draw out' the jurors in direct response to questions posed to a much smaller group than is ordinarily utilized by this Court.
"E. This Court finds that the State's questioning of minority jurors was meaningful and that the State questioned minority jurors as extensively as majority jurors and with the same meaningful questions. The trial court notes no significant difference in the voir dire examination of minorities when compared with the voir dire examination of majority jurors.
"F. This Court finds that there was no disparate treatment of members of the jury venire with the same characteristics by the State of Alabama. There is no evidence of disparate treatment by the State of jurors who answered questions in the same or a similar manner.
"G. The Court finds that the State of Alabama did not use all or most of its challenges to strike blacks from the jury. The Court further finds that there is no evidence of disparate impact on minority venire members and [therefore there is] no circumstantial evidence of any intent by the State to improperly strike the jury for this case.
"H. The Court finds that the State of Alabama did not use peremptory challenges to dismiss all or most black jurors. The transcript clearly reflects the statistical evidence that was argued and presented to the Court in the State's effort to defeat the defendant's Batson motion.

*1160 "The trial court, without question, gave due consideration to the numerical evidence of four black jurors on the jury sworn to hear this case, but the Court gave ample consideration to the other factors which are enumerated above and the totality of the voir dire striking process. Based on the Court's personal observation and the transcript of this case, there is no indicia of discriminatory striking or selection of the jury that would support a finding of a prima facie case of improper conduct on the part of the District Attorney under Batson v. Kentucky and its progeny. This is the finding of this Court whether it gives consideration to the statistical data discussed in the transcript or not."
It is clear from the findings of the trial court that its comparison of the racial composition of the jury to that of the jury venire and the population of the county was only one factor among several that it considered. The trial court's decision to deny the motion to quash did not violate the holding in Ex parte Thomas, as the appellant contends. The appellant's Batson objection was based solely on the number of minorities struck by the state. He offered no other evidence or supporting circumstances. The findings of the trial court set out above are supported by the record. We concur in the finding of the trial court that the appellant failed to present a prima facie case of discrimination.

III.
The appellant contends that the trial court erred in allowing Dr. Kenneth Elliott Warner, who performed the autopsy on the victim's body, to testify over objection as to the cause of death of the victim because, he says, there was a missing link in the chain of custody of the body. He contends that there was "a period of almost one hour in which the body of the victim was not accounted for." He further contends that even if the body's location could be accounted for during that hour, no one testified that the body was not tampered with or that its condition at the autopsy was the same as it was at the time that death was pronounced, but rather the evidence indicated that the body had been altered. Specifically, he points to the discrepancy between the observations of Dr. Howard McVeigh, the emergency room physician, upon his treatment of the victim and Dr. Warner's findings from the autopsy. Dr. McVeigh testified that he observed three wounds to the victim, two of which were probable gunshot wounds, and that an X-ray taken while the victim was in the emergency room revealed what appeared to be three metallic objects. Dr. Warner testified that the X-ray taken for purposes of the autopsy revealed two projectiles and that he recovered from the body two metallic projectiles. On appeal, he argues that "establishing that nothing happened to the body is of prime importance," but he offers nothing to indicate that something did happen to the body. He has offered no evidence or argument as to how such a possibility would have affected the question of guilt.
The evidence showed that the victim was transported to Regional Medical Center (RMC), placed in trauma room no. 1 and, at approximately 7:00 p.m., turned over to Dr. McVeigh. Dr. McVeigh examined the victim and found that the pupils were fixed and dilated, an indication of cerebral death, and that there was no electrical activity in his heart, no pulses, and no respiration or respiratory effort. After unsuccessful attempts to resuscitate the victim, Dr. McVeigh pronounced him dead at 7:46 p.m. The victim's brother arrived at the hospital at approximately 8:00 p.m., and viewed the victim's body. At that time, there were police officers around the room where the body lay. Ralph Phillips, a deputy coroner, arrived at the RMC emergency room at 8:40 p.m., picked up the victim's medical records and hospital report, went to the room where the body was, and proceeded to examine the body of the deceased. After Phillips completed his examination and filled out his report, Keith Pettus, a hospital attendant, was called at 9:30 p.m. to move the body from trauma room No. 1 to the morgue, where he was met by security person Chris Mintz. Mintz unlocked the morgue, the body was placed inside the cooler, Pettus signed the log-in sheet at 9:45 p.m., and Mintz relocked the morgue. On the following morning, Phillips went to the morgue, where he unlocked the cooler, and picked up the body. Then he *1161 transported it to Tuscaloosa, where he turned it over to Dr. Warner.
It is true that the state presented no direct evidence as to the precise location of the body between 7:46 and 8:40 p.m., before the arrival of deputy coroner Phillips or as to who, if anyone, handled the body during that time.
"`The purpose for requiring that the chain of custody be shown is to establish to a reasonable probability that there has been no tampering with the evidence.' Ex parte Jones, 592 So.2d 210, 212 (Ala.1991); Harrell v. State, 608 So.2d 434, 437 (Ala.Crim. App.1992); Smith v. State, 583 So.2d 990 (Ala.Crim.App.1991), cert. denied, 583 So.2d 993 (Ala.1991). Moreover, the evidence need not negate the remotest possibility of substitution, alteration, or tampering, but instead must prove to a reasonable probability that the item is the same as it was at the beginning of the chain. Harrell, at 437; Ex parte Williams, 548 So.2d 518 (Ala.1989). Evidence has been held correctly admitted even when the chain of custody has a weak or missing link. Gordon v. State, 587 So.2d 427, 433 (Ala.Crim. App.1990), rev'd 587 So.2d 434 (Ala.), on remand, 587 So.2d 435 (Ala.Crim.App.), appeal after remand, 591 So.2d at 149 (Ala. Crim.App.1991); Shute v. State, 469 So.2d 670, 674 (Ala.Crim.App.1984). In Gordon, this court held that because there was no evidence that the victim's body had been tampered with in any way, a sufficient chain of custody had been established. Gordon, 587 So.2d at 433."
Slaton v. State, 680 So.2d 879, 893 (Ala.Cr. App.1995), aff'd, 680 So.2d 909 (Ala.1996), cert. denied, ___ U.S. ___, 117 S.Ct. 742, 136 L.Ed.2d 680 (1997).
Dr. McVeigh testified that when he treated the victim in the emergency room, he discovered three wounds, which his notes described as follows: "gunshot wound, probable entrance, to left flank posteriorly; [o]ne right lower anterior chest wall; [and] one I did not describe as gunshot or otherwise, right lower periumbilical." He also stated that he observed three metallic objects depicted on the X-ray taken at the time of his examination. Dr. McVeigh explained that there could be three possible explanations for the three metallic objects he observed on the X-ray: (1) the victim had been shot three times; (2) the victim had been shot less than three times but something metallic was either on him, in his clothing (because this was a life-threatening emergency situation, the victim's clothing was not removed entirely before the X-ray was taken), or on the spine board beneath him; or (3) the victim had been shot before. Dr. Warner, who performed the autopsy, testified that he also observed three wounds to the victim's body, which he described as one entrance wound to the right side of the chest anteriorly, one shored exit wound where the bullet entering from the right side of the chest anteriorly broke the skin but did not exit, and one entrance wound to the left side back posteriorly inflicted by a bullet that did not exit. He further stated that the X-ray taken during the autopsy showed two projectiles in the body and that he removed two projectiles from the body. When asked to explain the discrepancy between the hospital X-rays and the autopsy X-rays, he stated that the hospital X-ray
"would had to have been an emergency X-ray, which would be done with the person's clothing on, without the adequate usual preparation, so that there could be projectiles or buttons or bone fragments or something that could be misinterpreted as bullets. Could have been under the body. He could have been shot at three times. One of the projectiles perhaps in the clothing.[6]... It could have been a misinterpretation of a bullet by the edge of a bone, which looks just like a bullet. It could have been a button. Could have been an old bullet that I didn't find. All of my pathways were accounted for."
The appellant is arguing that the testimony as to the cause of death was inadmissible, asserting that somehow an alleged third bullet disappeared from the victim's body in the one hour between his being declared dead and his body being moved to the morgue. We consider such a possibility of a third bullet in the victim's body to be beyond any *1162 realm of reality. The evidence, although some circumstantial, established beyond a reasonable probability that the body remained in trauma room no. 1 until it was transferred to and locked in the morgue and that the body remained in the same condition from the time of death until the autopsy was performed. (See also Slaton v. State, 680 So.2d at 893, recognizing the differences between a body and "blood samples, saliva samples, drugs seized from a defendant, and the like, all of which may be tampered with or even switched with no visible signs that something is different.") Moreover, the explanations of the two doctors as to the possible reasons for the apparently conflicting results of the two X-rays were consistent and overwhelmingly satisfactory in light of the other undisputed evidence.
Assuming that the victim's body did contain a third bullet as the appellant asserts, the alleged third bullet would have had to come from the same weapon that fired the two projectiles retrieved from the victim's body. We arrive at this conclusion from the undisputed ballistics evidence that the three shells retrieved at the scene were expended from the gun that was traced back to the appellant and that fired the two projectiles that were retrieved from the body. A third bullet retrieved from the body would have had no impact on a theory of innocence. In fact, obviously, it would have been only further confirmation of the appellant's intent to kill and of his guilt. The appellant's guilt is solidly established by the two bullets removed from the body the two bullets that Dr. Warner found to have caused the victim's death.
There is only one other theory that could be argued from the presence of a third bullet before the autopsy but not when the autopsy was performed: that the two bullets implicating the appellant were planted in the victim's body during the one hour that the appellant contends the body was unattended. Such a theory is absurd.
Based on the evidence and the reasonable inferences to be drawn therefrom, we find no error in allowing Dr. Warner to testify as to the cause of the victim's death.

IV.
The appellant contends that the trial court failed to enter specific written findings concerning the existence or nonexistence of each aggravating circumstance, each statutory mitigating circumstance, and any additional mitigating circumstances offered, and failed to summarize the crime and the appellant's participation in it, as required by § 13A-5-47(d). In response to the first remand of this case, the trial court filed a written sentencing order complying with the requirements of § 13A-5-47(d), and it is now part of the record.

V.
In the appellant's brief to this court, he reiterates our responsibility in reviewing cases where the death penalty has been imposed, as required by § 13A-5-53, which we undertake to do in part VI of this opinion. He urges us to determine that the death sentence was not appropriate in his case and that it was imposed under the influence of passion, prejudice, or arbitrary factors. He bases these contentions on his assertions that he "was sentenced to death by a jury from which the State had improperly struck members of his own race," and that he was sentenced by the same jury that had found him guilty of the capital crime. We have disposed of these assertions in parts I and II of this opinion.
The appellant's assertion that the aggravating circumstances are outweighed by the mitigating circumstances and that his sentence is thus inappropriate will be discussed in part VI of this opinion.
The appellant appears to urge us to compare the facts of his case with other capital cases in determining whether his sentence of death is excessive or disproportionate to the penalty imposed in similar cases. We first note that such a comparison is not constitutionally required. In Ex parte Barbour, 673 So.2d 473, 474 (Ala.1995), cert. denied, 518 U.S. 1020, 116 S.Ct. 2556, 135 L.Ed.2d 1074 (1996), the Court stated,
"The Legislature, in adopting § 13A-5-53(b)(3) [requiring the appellate court to determine whether the sentence of death is *1163 excessive or disproportionate to the penalty imposed in similar cases], was attempting to follow the mandate of the United States Supreme Court, in Gregg v. Georgia, 428 U.S. 153 [96 S.Ct. 2909, 49 L.Ed.2d 859] (1976), that appellate courts examine all death sentences to ascertain `whether the crime was in fact one properly punishable by death, whether similar crimes throughout the state are being punished capitally and whether the sentence of death is appropriate in relation to the particular defendant.' Beck v. State, 396 So.2d 645, 664 (Ala.1980). The United States Supreme Court, in a decision after Gregg, has held that comparative proportionality review is not constitutionally required in every state court death sentence review. Pulley v. Harris, 465 U.S. 37, 43-51 [104 S.Ct. 871, 875-879, 79 L.Ed.2d 29] (1984). In fact, the United States Supreme Court has specifically rejected the claim that a capital defendant can prove an Eighth Amendment violation `by demonstrating that other defendants who may be similarly situated did not receive the death penalty.' McCleskey v. Kemp, 481 U.S. 279, at 306-307 [107 S.Ct. 1756, at 1774-1775, 95 L.Ed.2d 262] (1987)."
While a comparative proportionality review is not constitutionally required, § 13A-5-53(b)(3) requires one. However, we need not make "an explicit, detailed account of [our] comparison." Lindsey v. Smith, 820 F.2d 1137, 1154 (11th Cir.1987), cert. denied, 489 U.S. 1059, 109 S.Ct. 1327, 103 L.Ed.2d 595 (1989) (holding that such an account is not mandated as a matter of federal constitutional law). We wholeheartedly agree with the following observation made in regard to our application of the review mandated by § 13A-5-53(b)(3):
"Based on their own past experience in reviewing capital punishment cases, state appellate courts `can rationally distinguish between those individuals for whom the death penalty is an appropriate sanction and those for whom it is not,' Spaziano v. Florida, 468 U.S. 447 [104 S.Ct. 3154, 82 L.Ed.2d 340] (1984), without listing in their opinions the facts that did or did not justify the imposition of the death penalty in prior cases."
Id.
Finally, the appellant argues that his crime was not especially heinous, atrocious, or cruel when compared to other capital offenses. The trial court specifically found that this aggravating circumstance did not exist.

VI.
In accordance with Ala.R.App.P. 45A, we have examined the record in this case for any plain error, whether or not brought to our attention or to the attention of the trial court. We have found no "plain error or defect in the proceedings," either in the guilt phase or in the sentencing phases of the trial.
While we found no plain error in our review of the record, we did find that the trial court erred in considering the appellant's juvenile record as part of its basis for rejecting the statutory mitigating circumstance of no significant history of prior criminal activity, § 13A-5-51(1).[7] Even though no objection was raised as to this matter in the trial court or on appeal, we believe a discussion of it is warranted. In addressing the statutory mitigating circumstances during the sentencing hearing before the trial court, it stated:
"The first [statutory mitigating circumstance listed in the statute] is that the defendant had no significant history of prior criminal activity. The court has fully reviewed the criminal history provided [in the pre-sentence investigation report] under records of arrest, dates, jurisdictions, and dispositions involving the defendant, Mr. Davis, from 1982 up and through the present date. And the court finds that lack of ... significant history of prior criminal activity would not be a mitigating circumstance and is not a mitigating circumstance in the case of the defendant, Mr. Davis." *1164 In its sentencing order, the trial court made the following findings:
".... That the defendant in fact does have a significant history of criminal activity. The written presentence investigation report reflects that since 1982 the defendant's Juvenile Court history reflects adjudications of delinquency for theft, receiving stolen property and trespass. The defendant's misdemeanor history since 1987 reflects adjudications of guilt for theft, resisting arrest, assault, and trespass. The defendant was in addition convicted of the felony robbery 3rd degree in 1992."
Juvenile adjudications are not convictions and are not criminal in nature, and thus cannot be considered as prior criminal activity under § 13A-5-51(1) for sentencing purposes. Freeman v. State, 555 So.2d 196 (Ala.Cr.App.1988), aff'd, 555 So.2d 215 (Ala.1989); aff'd, 496 U.S. 912, 110 S.Ct. 2604, 110 L.Ed.2d 284 (1990). Only convictions can negate the statutory mitigating circumstance of no significant history of prior criminal activity. Id. However, the record shows that in finding that the statutory mitigating circumstance of no significant prior criminal record did not exist, the trial court also considered the appellant's felony conviction of the offense of robbery in the third degree along with several convictions for misdemeanors, i.e., two convictions for theft of property in the third degree, one for resisting arrest, three for assault in the third degree, and one for criminal trespass. "We have upheld the practice of not applying this mitigating provision when the significant history was based on prior misdemeanor convictions." Williams v. State, 601 So.2d 1062, 1084 (Ala.Cr.App.1991), cert. denied, 662 So.2d 929 (Ala.1992), cert. denied, 506 U.S. 957, 113 S.Ct. 417, 121 L.Ed.2d 340 (1992). In our opinion, such criminal convictions, i.e., the felony and seven misdemeanor convictions, sufficiently negate this mitigating circumstance.
Therefore, in light of the appellant's criminal record as an adult and the trial court's consideration of that record, any error in the trial court's considering the appellant's juvenile record was harmless. Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); Freeman; Ala. R.App.P. 45. After finding error, an appellate court may still affirm a conviction or sentence on the ground that the error was harmless, if indeed it was. Chapman; Sattari v. State, 577 So.2d 535 (Ala.Cr.App. 1990), cert. denied, 577 So.2d 540 (Ala.1991); A.R.App.P. 45. Moreover, the harmless error rule applies in capital cases. Ex parte Whisenhant, 482 So.2d 1241 (Ala.1983); Henderson v. State, 583 So.2d 276 (Ala.Cr. App.1990), aff'd, 583 So.2d 305 (Ala.1991), cert. denied, 503 U.S. 908, 112 S.Ct. 1268, 117 L.Ed.2d 496 (1992); Musgrove v. State, 519 So.2d 565 (Ala.Cr.App.), aff'd, 519 So.2d 586 (Ala.1986), cert. denied, 486 U.S. 1036, 108 S.Ct. 2024, 100 L.Ed.2d 611 (1988). In order for a constitutional error to be deemed harmless under Chapman, the state must prove beyond a reasonable doubt that the error did not contribute to the verdict and/or sentence. In order for a nonconstitutional error to be deemed harmless, the appellate court must determine with "fair assurance ... that the judgment was not substantially swayed by the error." Kotteakos v. United States, 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946). See Brecht v. Abrahamson, 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993); Vines v. United States, 28 F.3d 1123, 1130 (11th Cir.1994). Some errors are so fundamental to a fair trial that they are not subject to a harmless error analysis. Arizona v. Fulminante, 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). The error in the instant case is not such an error. In order for the error to be deemed harmless under Ala.R.App.P. 45, the state must establish that the error did not or probably did not injuriously affect the appellant's substantial rights. We find that the error committed by the trial court here was harmless beyond a reasonable doubt. The purpose of the harmless error rule is to avoid setting aside a conviction or sentence for small errors or defects that have little, if any, likelihood of changing the result of the trial or sentencing. We conclude that the error could not have contributed to the sentence, nor injuriously affected a substantial right of the appellant.
We have also reviewed the appellant's sentence as required by § 13A-5-53, *1165 which requires that, in addition to reviewing the case for any error involving the conviction, we shall also review the propriety of the death sentence. This review shall include a determination of (1) whether any error adversely affecting the rights of the appellant was made in the sentence proceedings; (2) whether the trial court's findings concerning the aggravating and mitigating circumstances were supported by the evidence; and (3) whether death is the appropriate sentence in the case. Section 13A-5-53(b) requires that, in determining whether death is the proper sentence, we must determine (1) whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; (2) whether an independent weighing by this court of the aggravating and mitigating circumstances indicates that death is the proper sentence; and (3) whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the appellant.
After the appellant was convicted of the capital offense charged in the indictment, a separate sentence hearing was held before the jury in accordance with §§ 13A-5-45 and -46. After hearing evidence concerning the aggravating and mitigating circumstances, after being properly instructed by the trial court as to the applicable law, and after being correctly advised as to its function in finding aggravating and mitigating circumstances, to the weighing of those circumstances, if appropriate, and to its responsibility in reference to the return of an advisory verdict, the jury, by a vote of 11 to 1, recommended that the appellant "be punished by death."
Thereafter, the trial court held another hearing, in accordance with § 13A-5-47, to determine the appellant's sentence. The trial court ordered, received, and considered a written presentence investigation report, as required by § 13A-5-47(b). The report was made a part of the record. The parties were furnished a copy of it, and the appellant was given an opportunity to raise objections to it. He did object to several items in the report, and the trial court noted those exceptions. After this court's first remand, the trial court entered specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in § 13A-5-49, each mitigating circumstance enumerated in § 13A-5-51, and any mitigating circumstance offered pursuant to § 13A-5-52, as well as written findings of fact summarizing the crime and the appellant's participation in it as required by § 13A-5-47(d).
In its findings of fact, the trial court found the existence of the following aggravating circumstances: (1) "that the defendant was previously convicted of a felony involving the use or threat of violence to the person, namely robbery in the third degree" (§ 13A5-49(2)); and (2) "[t]hat the capital offense was committed while the defendant was engaged in the commission of, or an attempt to commit, robbery, specifically robbery in the first degree" (§ 13A5-49(4)).
The trial court examined the evidence of statutory mitigating circumstances, pursuant to § 13A-5-51, and found the existence of one: the age of the appellant at the time of the crime (§ 13A-5-51(7)). The trial court found, "That the defendant's age at the time of sentencing is 23 years of age, and that while he is an adult ... his age is a mitigating factor or circumstance in this case." The record shows that the appellant was 22 years and 4 months of age when the crime was committed. At the sentencing hearing before the trial court, the trial court stated the following:
"The final mitigating circumstance enumerated in the Code of Alabama is the age of the defendant at the time of the crime. This Court notes that the defendant's date of birth is October 6, 1970, that the defendant is now 23 years of age. The age of the defendant as a mitigating circumstance, the majority of cases deals with the issue of whether the defendant adjudged guilty of a capital offense is a minor under the law or not. This Court does give some weight to the relatively young age of this defendant and will consider it as a mitigating circumstance in this case."
The court examined the evidence of nonstatutory mitigating circumstances, pursuant to § 13A-5-52, and found as nonstatutory mitigating circumstances: (1) the appellant's educational *1166 level, (2) his academic achievement level, (3) the factors in his upbringing, and (4) how he had lived his life up to the time. At the sentencing hearing before the trial court, the court stated:
"The Court is also called upon to consider any other mitigating circumstances or factors in the particular case.
"Counsel for the defendant has called upon this Court to give consideration to the defendant's educational level, to his educational achievement level, to the factors in his upbringing, and how he has lived his life to this point. And the Court does consider all of those in a general sense as mitigating factors in this case."
Thus, the trial court found the existence of two aggravating circumstances and five mitigating circumstances. It considered all of the evidence presented, arguments of counsel, and the presentence report along with the advisory verdict of the jury and pleas from the appellant's friends and family and weighed the aggravating circumstances against the mitigating circumstances, and sentenced the appellant to death.
The appellant was convicted of the offense of murder committed during an attempted robbery in the first degree, a capital offense under Alabama law. § 13A-5-40(a)(2). We take judicial notice that crimes similar to the crime committed by the appellant are being punished capitally throughout this state. See, e.g., Kuenzel v. State, 577 So.2d 474 (Ala.Cr.App.1990), aff'd, 577 So.2d 531 (Ala. 1991), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991); Henderson v. State, 583 So.2d 276 (Ala.Cr.App.1990), aff'd, 583 So.2d 305 (Ala.1991), cert. denied, 503 U.S. 908, 112 S.Ct. 1268, 117 L.Ed.2d 496 (1992); Stephens v. State, 580 So.2d 11 (Ala. Cr.App.1990), aff'd, 580 So.2d 26 (Ala.1991), cert. denied, 502 U.S. 859, 112 S.Ct. 176, 116 L.Ed.2d 138 (1991).
After carefully reviewing the record of both the guilt and the sentence phases of the appellant's trial, we find no error in the sentence proceedings that adversely affected the rights of the appellant. We further find that the findings and conclusions of the trial court are amply supported by the evidence. We concur in the judgment of the trial court that death is the appropriate sentence in this case. We find no evidence that the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor. Our independent weighing of the aggravating circumstances and the mitigating circumstances convinces us that the sentence of death is appropriate for this appellant. Finally, considering the crime committed and considering the appellant, we find that the sentence of death is neither excessive nor disproportionate to the penalty imposed in similar cases.
Accordingly, the appellant's conviction and sentence of death are due to be, and they are hereby, affirmed.
The foregoing opinion was prepared by Retired Appellate Judge John Patterson while serving on active duty status as a judge of this court under the provisions of § 12-18-10(e), Ala.Code 1975.
AFFIRMED.
All Judges concur.
NOTES
[1] "The decision of the jury to recommend a sentence of death must be based on a vote of at least 10 jurors." § 13A-5-46(f), Code of Alabama 1975.
[2] While the jury's recommendation concerning the sentence shall be given consideration, it is not binding upon the trial court. § 13A-5-47(e).
[3] In considering what constitutes plain error in a capital case, we have adhered to the interpretation of the term "plain error" adopted by the Alabama Supreme Court, which follows the interpretation given that term by the Federal courts. See Ex parte Harrell, 470 So.2d 1309 (Ala.1985); Ex parte Womack, 435 So.2d 766 (Ala.1983). See also Hooks v. State, 534 So.2d 329 (Ala.Cr.App.1987), aff'd, 534 So.2d 371 (Ala. 1988), cert. denied, 488 U.S. 1050, 109 S.Ct. 883, 102 L.Ed.2d 1005 (1989). Plain error is error that "has or probably has adversely affected a substantial right of the appellant," Ala.R.App.P. 45A, or is so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings. Ex parte Womack. The failure to object at trial weighs against any claim of prejudice an appellant may make. Kuenzel v. State, 577 So.2d 474 (Ala.Cr.App.1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991).
[4] Pursuant to the plea agreements, Terrance was sentenced to 10 years' imprisonment and Alphonso to 20 years' imprisonment. They did not appeal.
[5] The United States Supreme Court in Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), set the early standard for a court's exclusion for cause of veniremembers who express opposition to the death penalty. The Court, in dicta, limited exclusion for cause to those veniremembers who made it "unmistakably clear (1) that they would automatically vote against imposition of capital punishment ... or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's guilt." Id. at 522-523 n. 21, 88 S.Ct. at 1776 n. 21. Subsequently, in Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), the Court clarified its decision in Witherspoon, holding that the trial court may exclude veniremembers in capital cases whose views would "`prevent or substantially impair the performance of [his] duties as a juror in accordance with his instructions and oath.'" Id., at 424, 105 S.Ct. at 852 (quoting Adams v. Texas, 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980)). The Witt standard dispensed with the Witherspoon requirement of "automatic" decisionmaking, and eliminated the requirement that a veniremember's bias be proved with "unmistakable clarity." 469 U.S. at 424, 105 S.Ct. at 852.
[6] However, Dr. Warner also testified that he found no bullet in the victim's clothing.
[7] There is no question that the jury's sentencing was not tainted by a consideration of the appellant's juvenile record: the jury received no evidence of his juvenile record and defense counsel did not argue the existence of this particular mitigating circumstance.